34 F.3d 220
 63 USLW 2093
 MOBIL OIL CORPORATION, Plaintiff-Appellee,
v.
VIRGINIA GASOLINE MARKETERS AND AUTOMOTIVE REPAIR
ASSOCIATION, INCORPORATED, Defendant-Appellant,
and
Attorney General of the Commonwealth of Virginia;
Commissioner of Agriculture and Consumer Services
of Virginia, Defendants,
Minnesota Service Station Association; Iowa Retail Gasoline
and Automotive Trades Association; North Dakota Petroleum
Marketers Association; Service Station Dealers Association
of Michigan; Wisconsin Retail Gasoline and Automotive
Trades Association; Service Station Dealers of America,
Amici Curiae.
MOBIL OIL CORPORATION, Plaintiff-Appellee,
v.
ATTORNEY GENERAL OF THE COMMONWEALTH OF VIRGINIA, Defendant-Appellant,
and
Commissioner of Agriculture and Consumer Services of
Virginia; Virginia Gasoline Marketers and
Automotive Repair Association,
Incorporated, Defendants,
Minnesota Service Station Association; Iowa Retail Gasoline
and Automotive Trades Association; North Dakota Petroleum
Marketers Association; Service Station Dealers Association
of Michigan; Wisconsin Retail Gasoline and Automotive
Trades Association; Service Station Dealers of America,
Amici Curiae.
MOBIL OIL CORPORATION, Plaintiff-Appellant,
v.
ATTORNEY GENERAL OF THE COMMONWEALTH OF VIRGINIA; Virginia
Gasoline Marketers and Automotive Repair
Association, Incorporated, Defendants-Appellees,
and
Commissioner of Agriculture and Consumer Services of
Virginia, Defendant,
Minnesota Service Station Association; Iowa Retail Gasoline
and Automotive Trades Association; North Dakota Petroleum
Marketers Association; Service Station Dealers Association
of Michigan; Wisconsin Retail Gasoline and Automotive
Trades Association; Service Station Dealers of America, Amici Curiae.
 Nos. 92-2242, 92-2244 and 92-2256.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 30, 1993.
Decided July 19, 1994.
 
 ARGUED: Peter Robert Messitt, Asst. Atty. Gen., Office of Atty. Gen., Richard McPhail Bing, Elmore, Pearce & Bing, Richmond, VA, for appellants. Dimitri George Daskal, Alexandria, VA, for amicus curiae Service Station Dealers of America. Thomas G. Slater, Jr., Michael J. Lockerby, Jr., Hunton & Williams, Richmond, VA, for appellee. ON BRIEF: Stephen D. Rosenthal, Atty. Gen. of VA, Eric K. G. Fiske, Asst. Atty. Gen., Office of Atty. Gen., Richmond, VA, Gerald M. Bowen, Mc Lean, VA, for appellants. R. Hewitt Pate, Michael C. Whitticar, Hunton & Williams, Richmond, VA, Edward H. Beck, III, Mobil Oil Corp., Fairfax, VA, for appellee. Randy V. Thompson, Persian, MacGregor & Thompson, Minneapolis, MN, for amici curiae Minnesota Service Station Ass'n, et al.
 Before ERVIN, Chief Judge, HALL, Circuit Judge, and CHAPMAN, Senior Circuit Judge.
 Affirmed in part and reversed in part by published opinion. Senior Judge CHAPMAN wrote the majority opinion, in which Judge HALL joined. Chief Judge ERVIN wrote a dissenting opinion.
 OPINION
 CHAPMAN, Senior Circuit Judge.
 
 
 1
 This case addresses the validity of amendments to the Virginia Petroleum Products Franchise Act under the United States and Virginia Constitutions. These amendments, known collectively as S.B. 235, prevent the inclusion of certain terms in agreements between petroleum refiners and their franchisees. Mobil Oil Corporation brought suit against the Attorney General of Virginia seeking a declaratory judgment that S.B. 235 is unconstitutional and an injunction preventing S.B. 235's enforcement. The Attorney General appeals the district court's determination that the Petroleum Marketing Practices Act, 15 U.S.C.A. Secs. 2801-2806 (West 1982), preempts all but the "rent control" provision of S.B. 235, and that S.B. 235 violates the Virginia Constitution's prohibition on special laws. Mobil appeals the district court's grant of summary judgment against Mobil on its claims: (1) that S.B. 235 violates the Contract and Takings Clauses of the United States Constitution, (2) that the Act is preempted by the Lanham Act, and (3) that the "rent control" provision is preempted by the PMPA.
 
 I.
 
 2
 Mobil Oil Corporation is involved in all aspects of the petroleum industry, including exploration, drilling, production, refining, and distribution. Mobil brand petroleum products are marketed to the public through service stations, most of which fall into one of four categories:
 
 
 3
 1) SALOPS (Salary Operated), which are owned and operated by Mobil and staffed with salaried personnel;
 
 
 4
 2) OG & L (Owned Station, Ground Lease Station and Leased Station), which are operated by franchisees who lease their stations and equipment from Mobil;
 
 
 5
 3) N (no lease dealers) operated by independent owners, who purchase Mobil petroleum products under franchise agreements; and
 
 
 6
 4) Distributor Stations, which are owned and operated by wholesale distributors of Mobil products.
 
 
 7
 The Petroleum Marketing Practices Act (PMPA) governs the relationships between petroleum refiners and their retail franchisees. The PMPA's primary purpose is to protect petroleum franchisees from arbitrary or discriminatory terminations and nonrenewals. S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.C.C.A.N. 873, 874. This Act also serves two secondary purposes: to provide uniformity in the law governing petroleum franchise termination and nonrenewal, and to allow franchisors flexibility in dealing with franchisee misconduct or changes in market conditions. 1978 U.S.C.C.A.N. at 877. It expressly preempts state law governing termination or nonrenewal which differs from its provisions. 15 U.S.C.A. Sec. 2806(a).
 
 
 8
 The Virginia Petroleum Products Franchise Act (VPPFA) also regulates the refiner-franchisee relationship. Va.Code Ann. Secs. 59.1-21.8 to -21.18(1) (Michie 1992). S.B. 235 became effective as an amendment to the VPPFA in July 1990 and contains:
 
 
 9
 1) a prohibition on gasoline purchase or sales quotas (the "no quotas" provision) (59.1-21.16:2(C));
 
 
 10
 2) a prohibition, with an exception not relevant here, on refiner-required hours of operation exceeding sixteen consecutive hours per day or six days per week (the "no minimum hours" provision) (59.1-21.11(1));
 
 
 11
 3) a requirement that rents be "based on commercially fair and reasonable standards" and "uniformly applied to similarly situated dealers of the same refiner in the same geographic area" (the "rent control" provision) (59.1-21.11(6));
 
 
 12
 4) a requirement that all franchise renewals extend at least three years (the "minimum renewal" provision) (Id.); and
 
 
 13
 5) a prohibition on refiner limits as to the number of stations a single dealer can operate (the "no maximum stations" provision) (59.1-21.11(4)).
 
 
 14
 These sections prohibit certain terms contained in Mobil's standard service station franchise agreements.[1] Mobil claims that when it ceased enforcing the prohibited terms so as to comply with S.B. 235, its sales and the profitability and value of its service station operations in Virginia declined.
 
 
 15
 Mobil filed suit against Virginia's Attorney General on June 29, 1990 claiming S.B. 235 was unconstitutional because: 1) it was preempted by the PMPA; 2) it violated the Special Laws provision of the Virginia Constitution; 3) it was preempted by the Lanham Act; 4) it violated the Contract Clauses of the United States and Virginia Constitutions; and 5) it violated the Takings Clauses of the United States and Virginia Constitutions. At the close of discovery, the Attorney General moved for summary judgment on all counts, and Mobil moved for summary judgment on its claims that S.B. 235 was preempted by the PMPA and violated Virginia's special laws prohibition. The district court found that the questions of PMPA preemption and the Special Laws violation were ripe for summary judgment, but that additional evidence on the Lanham Act, Contract Clause and Takings Clause claims would be necessary. The court reserved ruling on the summary judgement motions and heard the testimony of a number of witnesses.
 
 
 16
 The district court then found that S.B. 235 was not preempted by the Lanham Act, that the Virginia Act did not violate the Contract Clause or the Takings Clause, and that the PMPA did not preempt the "rent control" provision of S.B. 235. The court granted Mobil's cross motion for summary judgment in part, and found that S.B. 235 violated Virginia's special laws prohibition and that the PMPA preempted the "no quotas," "no minimum hours," "no maximum stations" and "minimum renewal" provisions of the Virginia Act. Both parties appeal.[2] The Virginia Gasoline Marketers and Automotive Repair Association, the national dealers' organization and similar groups from other states filed amicus briefs supporting the Attorney General's position on the issue of PMPA preemption, and we have considered these briefs in reaching our conclusions.
 
 II.
 
 17
 Under the Supremacy Clause of the United States Constitution, federal law may preempt state legislation governing the same subject matter. U.S. Const. art VI, cl. 2.; Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Preemption will occur if Congress has expressly stated its intent to preclude state regulation of the subject. 476 U.S. at 368, 106 S.Ct. at 1898. The PMPA contains the following express preemption clause:
 
 
 18
 To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.
 
 
 19
 15 U.S.C.A. Sec. 2806(a) (West 1992) (emphasis supplied). Thus, any state law "with respect to" termination and nonrenewal is preempted if it is not "the same as" the PMPA's provisions on termination and nonrenewal. The challenged provisions of S.B. 235 are not "the same as" the PMPA because they prohibit contractual terms the PMPA does not directly address. Nevertheless, the Attorney General contends that S.B. 235 is not preempted because it is not "with respect to" termination and nonrenewal.
 
 
 20
 The Attorney General argues that the PMPA only preempts state statutes that expressly address termination and non-renewal. He argues that S.B. 235's prohibition on certain contractual terms addresses "substantive" contract elements and thus is not "with respect to" termination and nonrenewal. Resolution of the preemption issue therefore turns on whether S.B. 235 is properly considered regulation "with respect to" termination or nonrenewal.
 
 
 21
 In Jimenez v. B.P. Oil, Inc., this court held that a Maryland statute requiring franchisors to make goodwill payments upon franchise termination was preempted by the PMPA in the context of the franchisor's complete withdrawal from the geographic market. 853 F.2d 268, 272-73 (4th Cir.1988), cert. denied, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989). The Jimenez court rejected the franchisee's argument that the PMPA preempted only state laws regarding the grounds for termination, and not statutes regarding the effects of termination, and it found that Congress intended to occupy the field of petroleum franchise termination and nonrenewal. Id. at 273.
 
 
 22
 Like the grounds/effects distinction in Jimenez, the Attorney General's distinction between regulation of "substantive" contract terms and direct regulation of termination and renewal is invalid on the facts of this case. The challenged provisions impact franchise termination and nonrenewal in two ways, and therefore are "with respect to termination" and "nonrenewal." First, S.B. 235 narrows the grounds for termination available to franchisors operating in Virginia. Under the PMPA, if contractual terms are reasonable and material, a franchisee's failure to comply with them is legitimate grounds for termination. 15 U.S.C.A. Sec. 2802(b)(2)(A) (West 1982). Unless the terms prohibited by S.B. 235 would in all circumstances be unreasonable and immaterial--a finding we are unwilling to make--S.B. 235 eliminates grounds for termination that would be available under the PMPA. See Darling v. Mobil Oil, 864 F.2d 981, 987 (2d Cir.1989). Second, S.B. 235 provides franchisees with a remedy for termination not "the same as" those set forth in the PMPA. If termination is based on noncompliance with franchise terms prohibited by S.B. 235, the franchisee may bring a wrongful termination action claiming the termination is illegal under Virginia law. Such a wrongful termination claim would not exist absent S.B. 235, because certain terms and conditions prohibited by S.B. 235 are allowed by the PMPA.
 
 
 23
 Congress used very broad language to define the PMPA's preemptive scope. The statute preempts any state law "with respect to" termination or nonrenewal which differs from the PMPA. By denying franchisors grounds for termination that are available under the PMPA and in providing franchisees with a remedy unavailable under the PMPA, S.B. 235 impacts franchise termination and nonrenewal to a degree sufficient to fall within this broad preemption clause.
 
 
 24
 The Attorney General argues that we should deny preemption, although the plain language of the statute requires it, because preemption would frustrate the PMPA's primary purpose, which is franchisee protection. "Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice--and it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." Rodriguez v. United States, 480 U.S. 522, 526, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (per curiam) (emphasis in original). The broad scope of the PMPA's preemption clause indicates that Congress chose to protect franchisees by the means provided in the federal statute and to preclude supplementary state regulation of termination and nonrenewal as a means of franchisee protection. Most petroleum franchisors do business in a number of states and Congress has provided a law to govern petroleum franchises in all 50 states to ensure uniformity.
 
 
 25
 The language of the PMPA clearly preempts legislation such as S.B. 235. "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' " United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Finding S.B. 235 preempted by the PMPA adheres to the language of the statute and is consistent with Congressional intent as it furthers two of the PMPA's goals, uniformity and franchisor flexibility. We therefore affirm the district court's determination that S.B. 235's provisions regarding no quotas, no minimum hours, minimum renewals and no maximum stations are preempted by the PMPA. Unlike the district court, we see no reason to conclude differently regarding the "rent control" provision.
 
 
 26
 The district court found that the PMPA did not preempt the "rent control" provision, because this provision, unlike the other provisions of the Virginia Act, regulates the substance of franchising agreements and does not implicate termination or nonrenewal.
 
 
 27
 The PMPA provides that grounds for nonrenewal of a petroleum franchise include:
 
 
 28
 [t]he failure of the franchisor and the franchisee to agree to changes or additions to the provisions of the franchise, if (i) such changes or additions are the result of determinations made by the franchisor in good faith and in the normal course of business; and (ii) such failure is not the result of the franchisor's insistence upon such changes or additions for the purpose of preventing the renewal of the franchise relationship.
 
 
 29
 15 U.S.C.A. Sec. 2802(b)(3)(A) (West 1982). Under this section, if the franchisor and franchisee are unable to agree on rent, the franchisor may refuse to renew provided he acts "in good faith and in the normal course of business" and not "for the purpose of preventing the renewal." However, under S.B. 235, even if the franchisor complies with the PMPA, a franchisee may contest a nonrenewal on the ground that rent demanded is not "based on commercially fair and reasonable standards" and "uniformly applied to similarly situated dealers of the same refiner in the same geographic area." The "rent control" provision of S.B. 235 is "with respect to" nonrenewal because it gives franchisees grounds to challenge nonrenewals that are valid under PMPA. See Esso Standard Oil Co. v. Department of Consumer Affairs, 793 F.2d 431, 434 (1st Cir.1986) (PMPA would preempt "any law that gave a franchisee a cause of action to contest a termination, when that termination would otherwise be valid under the PMPA"). We reverse the district court's decision that the PMPA does not preempt S.B. 235's "rent control" provision.
 
 III.
 
 30
 The Lanham Act states that it is intended to "protect registered marks used in [interstate] commerce from interference by State, or territorial legislation." 15 U.S.C.A. Sec. 1127 (West Supp.1994). Mobil argues that this language expressly preempts any state law that erodes the quality control necessary for a mark owner to protect his trademark image. Even if we assume that Sec. 1127 is an expression of intent to preclude state law, rather than merely a general statement of purpose,[3] protection of "registered marks" does not encompass a statute such as S.B. 235 which does not govern the appearance of, the ownership of, or the right to use franchisors' registered marks.
 
 
 31
 Although the Lanham Act does not expressly preempt S.B. 235, it may do so by implication. Federal law may preclude state law that is inconsistent with or frustrates the objectives of the federal law. See Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. at 368, 106 S.Ct. at 1898. The Lanham Act gives a mark owner the right to control the quality of goods associated with his mark. Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir.1991). Mobil contends that the "no maximum stations," "no quotas," and "no minimum hours" provisions of the Virginia Act are inconsistent with its right of quality control, because they prevent Mobil's effective regulation of the quality of goods and services sold in Mobil gas stations. We disagree.
 
 
 32
 The "no minimum hours" provision does not adversely affect the quality of services provided by Mobil service stations. Twenty-four-hour service is not an integral component of the Mobil service station product or of Mobil's trademark image, because Mobil does not apply the 24 hour operation requirement consistently, and the inability to require 24-hour operation does not detract from its trademark image.
 
 
 33
 The "no maximum stations" provision does not have a significant negative impact on Mobil's quality control efforts. This provision does not alter the franchisee's obligations to uphold Mobil's standards as set forth in the franchise agreement regarding business operations, customer service, and maintenance of the station premises. In addition, since Mobil hires salaried employees to operate some of its stations and is apparently satisfied with the quality of services provided by those stations, it is difficult to understand why a franchisee should not be able to hire equally qualified persons to operate franchisee stations.
 
 
 34
 Similarly, the "no quotas" provision does not prevent Mobil from maintaining the quality of its products and services. While Mobil cannot require that franchisees purchase a minimum amount of gasoline for resale, all gasoline sold under the Mobil mark must comply with Mobil's quality standards, and only Mobil brand gasoline may be sold through Mobil equipment. The dealer remains obligated under the franchise agreement to use "good-faith and best efforts to maximize the sale of Mobil brand fuel," to "maintain an inventory of Mobil brand motor fuel ... sufficient to serve customers during all business hours," to "exercise the highest degree of care and diligence in the handling, storage and sale of all products delivered to the marketing premises, and protect the quality of those products." The fact that a franchisee may not sell as much product as Mobil would desire does not adversely affect Mobil's trademark image, particularly when the product that is sold is supplied by Mobil, and the franchisee is in compliance with the other terms of the agreement.
 
 
 35
 A presumption against preemption arises when Congress does not state its intent. Abbot v. American Cyanamid Co., 844 F.2d 1108, 1112 (4th Cir.), cert. denied, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988). Consistent with this presumption and with our finding that S.B. 235 does not conflict with the Lanham Act's objectives, we find that the Lanham Act does not impliedly preempt the provisions of S.B. 235.
 
 IV.
 
 36
 It is well established that courts should refrain from addressing constitutional questions unless it is necessary to do so. Jean v. Nelson, 472 U.S. 846, 854, 105 S.Ct. 2992, 2996-97, 86 L.Ed.2d 664 (1985); Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). As we have already decided that S.B. 235 is invalid because it is preempted by the PMPA, we decline to address Mobil's arguments that S.B. 235 violates the Takings and Contract Clauses of the United States Constitution. For the same reason, we do not reach the issue of whether S.B. 235 violates the Special Laws prohibition of the Virginia Constitution.
 
 V.
 
 37
 For the reasons stated in this opinion, the decision of the district court is affirmed in part and reversed in part.
 
 
 38
 AFFIRMED IN PART AND REVERSED IN PART.
 
 ERVIN, Chief Judge, dissenting:
 
 39
 I agree with the majority that the Lanham Act does not preempt Virginia's petroleum franchise provisions. We part ways, however, because I do not agree that the Petroleum Marketing Practices Act, 15 U.S.C. Sec. 2801 et seq. (PMPA), through the operation of the Supremacy Clause, U.S. Const. art. VI, Sec. 2, preempts these Virginia laws. Accordingly, I dissent.
 
 I.
 
 40
 "Where a state statute conflicts with or frustrates federal law, the former must give way." CSX Transportation, Inc. v. Easterwood, --- U.S. ----, ----, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387, 396 (1993).
 
 
 41
 In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, preemption will not lie unless it is "the clear and manifest purpose of Congress."
 
 
 42
 Id. at ----, 113 S.Ct. at 1737, 123 L.Ed.2d at 396 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)); accord Cipollone v. Liggett Group, Inc., --- U.S. ----, ----, 112 S.Ct. 2608, 2617-18, 120 L.Ed.2d 407, 422 (1992) (plurality opinion). Indeed, the plurality in Cipollone indicated as well that when construing a preemption provision the outer boundaries of which are unclear, it is appropriate to adopt a narrower reading of the provision to avoid inadvertently trammeling upon state sovereignty and curtailing a legitimate exercise of state power when Congress had no such intention. --- U.S. at ---- - ----, 112 S.Ct. at 2618-19, 120 L.Ed.2d at 424.[1]A.
 
 
 43
 Congress enacted the PMPA in 1978. The statute contains three subchapters, only the first of which, titled "Franchise Protection," is at issue here. According to the Senate report accompanying the bill, "[t]he purpose of title I of H.R. 130 is the establishment of minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." S.Rep. No. 731, 95th Cong., 2d Sess. 15, reprinted in 1978 U.S.C.C.A.N. 873, 873.
 
 
 44
 The PMPA has an explicit preemption provision:
 
 
 45
 To the extent that any provision of this subchapter applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination (or the furnishing of notification with respect thereto) of any such franchise or to the nonrenewal (or the furnishing of notification with respect thereto) of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.
 
 
 46
 15 U.S.C. Sec. 2806(a). Thus, as the majority rightly indicates, this provision voids any state or local law that is not "the same as" any "applicable provision of this subchapter." However, this only applies to the extent that the state law differs with any provision of the subchapter that applies to the termination of a franchise, to the nonrenewal of a franchise relationship, or the furnishing of notice relating to either action.
 
 
 47
 As I read it, when the preemption provision nullifies "any provision of any law or regulation ... with respect to termination ... of any such franchise or to the nonrenewal ... of any such franchise relationship" it reflects a desire by Congress to eliminate inconsistent state statutes that govern the ending of such contracts and relationships, both in terms of the actual mechanisms of the termination as well as the notice necessary to effectuate such termination. Unlike the majority, I expressly do not think that the statute intended to void any state law provision that indirectly affects the termination or nonrenewal of the relationship by directly affecting the substance of the franchise contract itself, since such an approach sweeps too widely, more widely than the majority intimates in its opinion. In short, while Congress regulated the "end-game" scenarios of petroleum franchise agreements, it did not intend to affect the content of these contractual relationships, which are long-standing creatures of state law. I think that both a careful analysis of the statute itself, as well as an analysis of the submerged dangers of the majority opinion, reveal the correctness of this approach.
 
 B.
 
 48
 As noted above, the preemption provision requires us to begin by examining "any provision of this subchapter [that] applies to the termination (or the furnishing of notification with respect thereto) of any franchise, or to the nonrenewal (or the furnishing of notification with respect thereto) of any franchise relationship," for it is only state provisions that are not "the same as the applicable provision[s]" that are vitiated. This makes eminent sense, since in the general case, where there is an explicit preemption provision, we can expect that Congress intends the scope of that provision to hew closely to the substantive provisions of the statute and not to unnecessarily preempt, and thus create a vacuum in, areas in which Congress has not actually legislated. The result is that the outline of the statute almost always describes the circumference of its own preemption provision.
 
 
 49
 While it will come as no surprise that the Congressional enactment is dense reading of the most unpleasant kind, it is necessary to provide a brief overview of the statute that is being used to void the state law in question. Title I of the PMPA has three substantive provisions. All three deal exclusively with the allowability of and procedural issues related to the termination and nonrenewal of a franchise or franchise relationship. Section 2802(a) acts as a general prohibition against termination or nonrenewal of franchises except as allowed by Sec. 2802(b) or Sec. 2803. Section 2802(b) begins by requiring, for either terminations or nonrenewals, notice from the franchisor that conforms to strict rules, and then sets forth the rules with which terminations or nonrenewals must comply. Thus, Sec. 2802(b)(2) lists grounds for termination or nonrenewal of a franchise, which include failure by the franchisee to comply with any reasonable and materially significant provision of the franchise, provided certain notice is given; a failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise, provided certain warnings are given first; and an agreement in writing between the franchisor and franchisee to terminate or not renew, among other reasons. 15 U.S.C. Sec. 2802(b)(2).
 
 
 50
 Section 2802(b)(3) lists grounds for nonrenewal of the franchise relationship, including the failure of the parties to agree to changes or additions to the provisions of the franchise, provided the failure to agree is not a sham and such changes are determined to be necessary in good faith; the receipt of numerous customer complaints; and the failure to operate the premises in a clean, safe manner, among other reasons. Id. Sec. 2802(b)(3).
 
 
 51
 Section 2803 acts as an exception to the requirements of Sec. 2802 for franchise relationships involving "trial" or "interim" franchises, with extensive definitions as to which franchises fall within the scope of its exception. Finally, as noted above, Section 2804 governs the type and timing of notice required in advance of termination or nonrenewal.
 
 
 52
 This brief overview of the provisions of the PMPA indicates that the Act has a unitary focus on the architecture of the ending of franchises and franchise relationships. It thus prohibits any termination at all, except those that comply with its detailed provisions, and lists under what circumstances the relationship can be ended through termination or nonrenewal. It also provides strict rules concerning the notification requirements when the end is near.
 
 
 53
 What is conspicuously absent is any language governing the substance of the franchise agreement itself. The closest it comes is in Sec. 2802(b)(2)(A), where it states that one ground for terminating or not renewing the franchise relationship is "[a] failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship." 15 U.S.C. Sec. 2802(b)(2)(A). But even this subsection is neutral concerning the substance of the provisions that will justify termination. Contrary to Mobil's suggested approach, it merely states that, if some provision of the agreement is being cited as the basis for termination, it had better be a "reasonable" and materially significant one or else the inference is that it is pretextual, and thus prohibited.
 
 
 54
 Understanding that the operative provisions of the PMPA govern not the substantive contents of the franchise relationship or of a particular franchise contract, but only the reasons and circumstances under which such a relationship or contract can be abandoned, a rereading of the preemption provision makes clear the narrowness of its scope. By its terms, it only preempts "any provision of any law or regulation ... with respect to termination" or nonrenewal or the notice related thereto that is not "the same as the applicable provision" of the subchapter. Given that the only effect of the federal law's provisions is upon the contours of the relationship, but not upon its content, the limitation of the preemption provision to knocking out only those state laws not "the same as" the federal law clearly demonstrates that state laws that concern the substantive provisions that either must or may be included in the contract relationship are untouched by the PMPA.
 
 
 55
 Under this approach, state and federal law interact harmoniously to provide explicit governance of each part of the contractual relationship. Thus, states remain free to establish and develop the law governing the substance of petroleum franchises, an area of contract law historically governed by the states, while federal law is interjected only to impose uniformity upon the terms and conditions for the ending of that relationship. A practical glance at these relationships explains the logic of this burden-sharing: while the substance of the relationships is left to the states to regulate in conformity with their local needs and circumstances, the widespread abusive manipulation by a small number of national and multi-national oil companies of the terminations of "uppity" small franchisees to maintain their dominance justified a federal solution to a pervasive problem.[2] While federal law addresses a common problem, state law is not discarded in toto; rather, it retains its historic place within the federal scheme as the origin of the substantive law of the franchise relationship.
 
 
 56
 Prior treatment of the PMPA by this Circuit does not contradict this understanding of the statute. In Jimenez v. BP Oil, Inc., 853 F.2d 268, 273 (4th Cir.1988), cert. denied, 490 U.S. 1011, 109 S.Ct. 1654, 104 L.Ed.2d 168 (1989), we struck down a Maryland statute that required a franchisor to make goodwill payments upon termination of a franchise without consent of the franchisee. And justly so, since such a law interferes with the PMPA's careful regulation of the dos and don'ts of termination or nonrenewal; the congruity in purpose between the PMPA and the Maryland statute was apparent. In contrast, the Virginia statutes considered here relate not to the mechanics or terms of termination or nonrenewal, but rather address the substantive content of the contractual agreements themselves.
 
 C.
 
 57
 My greatest concern with the majority opinion stems not from what it says, but rather from what it suggests by implication. Each of the Virginia provisions is struck down because it "narrows the grounds for termination available to franchisors operating in Virginia." Ante, at 224. Because these provisions add or subtract from a ground upon which termination can be predicated, it "relates to" termination.
 
 
 58
 But certainly this reaches too far. For under this theory, any changes in state law, not just those particular to the petroleum franchise scenario, that affect the substance of these contract relationships must be struck down (at least as to petroleum franchisees) because they narrow the grounds for termination. There are numerous areas of state law that control a franchise agreement, all of which are subject to this same analytic structure, and thus eligible for limitation. Unfortunately, it is impossible to state with precision which of them are nullified under the majority's approach to this case, because the best we know is that any change in the law that deviates from the status quo ante by altering the grounds for termination, i.e., any change in substantive state law of whatever origin that either an oil company or franchisee does not like, is struck down under this reading of the statute.
 
 
 59
 "The goal of the framers of the PMPA was to create a uniform system of franchise termination, not a uniform system of contract law." O'Shea v. Amoco Oil Co., 886 F.2d 584, 593 (3d Cir.1989). As the First Circuit has noted, "[t]he primary objective of the PMPA was to protect franchisees from arbitrary and discriminatory termination." Esso Standard Oil Co. v. Department of Consumer Affairs, 793 F.2d 431, 434 (1st Cir.1986).The question presented by this case is whether the balance struck by the PMPA in the area of termination and nonrenewal also impliedly gives franchisors a substantive right to be free of state regulation of all elements of the franchise agreement. We do not believe it gives such protection.
 
 
 60
 Id. A franchise agreement is not an empty vessel; it is a legal relationship formed by and entered into against a backdrop of state law. I do not think that the limited, procedural provisions of the PMPA divested states of their governance of this area of law. This conviction is all the stronger because of the presumption against preemption with which we begin, which is an essential element of our federal system of government. Accordingly, I dissent.[3]
 
 
 
 [1]
 Because S.B. 235 governs only franchise agreements, Mobil's relationships with SALOPs and distributor stations are not affected
 
 
 [2]
 Although the district judge heard testimony on some issues, he did not make any findings of fact that have been contested and all parties have addressed this appeal as being from summary judgment. We have reviewed the district court's action under the summary judgment standard
 
 
 [3]
 This is uncertain since the Lanham Act contains another provision which more specifically preempts state law:
 No State or other jurisdiction of the United States or any political subdivision or any agency thereof may require alteration of a registered mark, or require that additional trademarks, service marks, trade names, or corporate names that may be associated with or incorporated into the registered mark be displayed in the mark in a manner differing from the display of such additional trademarks, service marks, trade names, or corporate names contemplated by the registered mark as exhibited in the certificate of registration issued by the United States Patent and Trademark Office.
 15 U.S.C.A. Sec. 1121 (West Supp.1994). This provision does not invalidate S.B. 235 because S.B. 235 does not affect the appearance of Mobil's mark as displayed by licensed users.
 
 
 [1]
 As this court recently stated:
 [I]n deciphering congressional intent, we are guided by principles of federalism. Where "the regulated conduct touched interests so deeply rooted in local feeling and responsibility, ... in the absence of compelling congressional direction, [the court] could not infer that Congress had deprived the States of the power to act." San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959).
 Feikema v. Texaco, Inc., 16 F.3d 1408, 1413 (4th Cir.1994).
 
 
 [2]
 The legislative history of the PMPA explains that one of its principal goals was to "remedy[ ] the disparity in bargaining power between franchisors and franchisees." It goes on to note:
 In recent years the friction between franchisors and franchisees in marketing of motor fuels has become so great that it has threatened adverse impacts upon the Nation's motor fuel distribution and marketing system. Numerous States have initiated various legislative actions to address these petroleum product franchising problems. These actions have, unfortunately, resulted in an uneven patchwork of rules governing franchise relationships, which differ from State to State.
 Needed is a single, uniform set of rules governing the grounds for termination and non-renewal of motor fuel marketing franchises and the notice which franchisors must provide franchisees prior to termination of a franchise or non-renewal of a franchise relationship. Such a set of rules would clearly define the rights and obligations of the parties to the franchise relationship in the crucial area of termination of a franchise or non-renewal of the franchise relationship.
 S. Rep. No. 731, 95th Cong., 2d Sess. 18-19, 1978 U.S.C.C.A.N. at 877 (emphasis supplied).
 
 
 [3]
 Mobil's brief raises numerous additional theories to invalidate Virginia's laws, none of which are addressed on their merits in the majority opinion. I do not address them here, except to indicate that I believe each is largely unconvincing, and that I would sustain the statutes from the various federal and state constitutional challenges brought against them