Jagdev S. **BAJWA**, Plaintiff,

v.

**SUNOCO, INC.** Defendant.

No. CIV.03–1085–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 16, 2004.

# 728

W. McCauley Arnold, McCandlish & Lillard, Fairfax, VA, for Plaintiff.

Michael J. Lockerby, Hunton & Williams LLP, Riverfront Plaza E. Tower, Richmond, VA, for Defendant.

## *MEMORANDUM OPINION*

CACHERIS, District Judge.

Plaintiff Bajwa, a gas station franchisee, brought this action against Defendant Sunoco, Inc. ("Sunoco") for an alleged breach of a franchise agreement and for compensation in connection with the Commonwealth's purchase of the property. This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment. The primary issue before in this case is whether a sale of property to a potential condemnor constitutes "a condemnation or other taking ... pursuant to the power of eminent domain"

within the agreement between the parties and the Petroleum Marketing Practices Act ("PMPA"). For the reasons stated below, the Court holds that such a sale is an "other taking" and a reasonable ground for terminating a franchise. Therefore, the Court will deny the Plaintiff's motion for summary judgment. The Court, however, will grant in part and deny in part the Defendant's motion for summary judgment as there is a genuine issue of material fact concerning the value of Bajwa's leasehold interest and its inclusion in the sale price.

## I. Background

The facts giving rise to this case are not in dispute. On April 11, 2001, Bajwa and Sunoco entered into a franchise agreement (the "Agreement"), under which Bajwa would operate a Sunoco gas station at 5928 Richmond Highway, Alexandria, VA 22303 (the "property"). (Def.Ex. 1.) The term of the contract extended from May 22, 2001 to May 21, 2004. (*Id.*) At all times relevant to this action, Bajwa operated the gas station in compliance with the terms of the lease.

Part III, paragraph 3.06 of the Agreement provides:

a. Should Premises in whole or in part, be condemned or otherwise taken pursuant to power of eminent domain, Company may terminate this Franchise at any time thereafter upon notice to Dealer

b. Dealer shall have no claim to any portion of a condemnation award payable to Company arising from any such taking or from damages to Premises resulting therefrom however Dealer may be entitled to any separate award payable to Dealer for taking of Dealer's leasehold in-

terest, loss of business opportunity, or goodwill.

(Def. Ex. 1 at 13.)

On July 10, 2002, the Virginia Department of Transportation ("VDOT"), through its contractor, the Terra Company, Inc ("Terra"),[1] notified Sunoco that the property would be "affected by the widening of the right of way" for the Woodrow Wilson Bridge. (Def.Ex. 2.) By letter of December 16, 2002, Terra offered to buy the property for $1,650,000. (Def.Ex. 3.) The letter informed Sunoco that its property was in the "fee take area" and the state's acquisition constituted a "total take of the property." (*Id.*)

On January 8, 2003, Terra notified Bajwa and Sunoco that the property was "being acquired by [VDOT]." (Def.Ex. 4.) Bajwa and Sunoco were notified to vacate the premises by April 8, 2003. (*Id.*) On February 3, 2003, Sunoco received a letter from Terra updating the schedule for vacation of the property. (Def.Ex. 5.) This letter stated that the property had to be vacated by April 7, 2003. (*Id.*) Furthermore, the letter reported that the discussions regarding the property acquisitions had been "inconclusive" and that it "appeared that this matter will not be resolved in the near future." (*Id.*) Therefore, Terra declared that it would "begin the process of acquiring title through eminent domain proceedings with the court." (*Id.*) Terra stated that it would notify Sunoco when the certificate of eminent domain was filed with the court. (*Id.*)

On January 9, 2003, Sunoco notified Bajwa that it was terminating the Agreement, because of VDOT's taking of the property. (Def. Ex. at 6.) Sunoco stated that the taking would occur on April 8, 2003. (*Id.*)

1. VDOT hired Terra "to acquire the necessary rights of way in connection with the expan-

sion of the Woodrow Wilson Bridge." (Def.Ex. 2.)

On March 5, 2003, Sunoco granted the Commonwealth of Virginia an option to purchase the property for $1,750,000. (Def.Ex. 7.) The option extended for a period of one year. (*Id.*) On April 8, 2003, the Commonwealth acquired the property from Sunoco for $1,750,000. Bajwa received none of the proceeds. (Pl. Mem. at 2.) Bajwa's franchise terminated that same day, and Sunoco removed its signs, pumps, and gasoline from the premises. (*Id.*)

Bajwa filed suit in Fairfax County Circuit Court on July 25, 2003. The Defendant removed the matter to this Court on August 6, 2003. Both parties have moved for summary judgment. These motions are currently before the Court.

## II. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Evans v. Techs. Apps. & Service, Co.,* 80 F.3d 954, 958–59 (4th Cir.1996) (citations omitted). In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.,* 933 F.2d 1253, 1259 (4th Cir.1991) (citations omitted).

The very existence of a scintilla of evidence or of unsubstantiated conclusory allegations, however, is insufficient to avoid summary judgment. *Anderson,* 477 U.S. at 248–52, 106 S.Ct. 2505. Rather, the Court must determine whether the record

as a whole could lead a reasonable trier of fact to find for the non-movant. *Id.* at 248, 106 S.Ct. 2505.

## III. Analysis

The Court must resolve two questions: (A) Did Sunoco violate either the PMPA or the Agreement in terminating Bajwa's franchise; and (B) If Sunoco did not wrongfully terminate the franchise, is Bajwa owed compensation under the lease, the PMPA, or state law.

## A. Wrongful Termination of the Franchise

Plaintiff argues that Sunoco breached the agreement, because Sunoco terminated the lease prior to the condemnation of the property by the Commonwealth. Since there was no actual condemnation of the property, the sale by Sunoco to the Commonwealth, according to Bajwa, was a consensual transaction. Sunoco responds that even though the property was eventually "sold" to the state, the Commonwealth condemned or took the property within the meaning of paragraph 3.06 of the Agreement and 15 U.S.C. § 2802(c)(5). Sunoco maintains that VDOT initiated the condemnation proceedings by making an offer to purchase the property pursuant to Va. Code Ann. § 25.1–204(A). Therefore, the termination of the franchise was "reasonable" within the PMPA and did not violate the contract. The question that the Court must answer is whether the sale of property to a state constitutes "condemnation or other taking … pursuant to the power of eminent domain" within the meaning of the PMPA.[2]

### 1. Condemnation Under the PMPA

 The Petroleum Marketing Practices Act governs the relationships be-

---

2. The language in paragraph 3.06(a) of the Agreement and § 2802(c)(5) are identical. The Court need only determine if Sunoco breached its obligations under the PMPA, be-

cause the inquiry is the same: Was Sunoco's sale of the premises to Virginia an "other taking … pursuant to the power of eminent domain."

tween petroleum refiners and their retail franchisees. *Mobil Oil Corp. v. Virginia Gasoline Marketers & Auto. Repair Ass'n,* 34 F.3d 220, 223 (4th Cir.1994). The PMPA's primary purpose is to protect petroleum franchisees from arbitrary or discriminatory terminations and nonrenewals. *Id.* The Act also serves two secondary purposes: to provide uniformity in the law governing petroleum franchise termination and nonrenewal; and to allow franchisors flexibility in dealing with franchisee misconduct or changes in market conditions. *Id.*

The PMPA generally prohibits termination of a franchise or nonrenewal of a franchise relationship unless the franchisor both complies with the notification provisions of the statute and bases its decision upon a ground described in the statute. 15 U.S.C. § 2802(a); *L.M.P. Serv., Inc. v. Shell Oil Co.,* 128 F.Supp.2d 287, 289 (D.Md.2000). Section 2802 lists valid bases for "reasonable" termination of a franchise agreement. Section 2802(b)(2)(C) establishes the following as a valid ground for termination:

> The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence.

15 U.S.C. § 2802(b)(2)(C).

█ The PMPA lists twelve events that are *per se* reasonable. 15 U.S.C. § 2802(c). Neither party disputes that condemnation, under 15 U.S.C. § 2802(c)(5), constitutes an event the "occurrence of ... which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is

reasonable." *Romero Rodriguez v. Esso Standard Oil Co.,* 636 F.Supp. 615, 616–17 (D.P.R.1986). However, this list is nonexclusive, and courts may examine the reasonableness of the franchisor's actions when based upon grounds not enumerated in the statute. *See Lugar v. Texaco,* 755 F.2d 53, 57–58 (3d Cir.1985).

Courts have held that franchisors did not violate the PMPA when the state had initiated condemnation proceedings. *See Halder v. Standard Oil Co.,* 642 F.2d 107, 111–12 (5th Cir.1981)(affirming district court's ruling that the oil company did not violate the PMPA by failing to renew a franchisee's lease at the end of its term, but continued the franchise relationship on a month-to-month basis after being notified of Georgia's intent to condemn the property); *Rodriguez,* 636 F.Supp. at 617 (holding that oil company did not violate the PMPA by terminating the gas station franchise following condemnation of portion of the franchisee's land, despite franchisee's belief that condemnation would be beneficial to the franchised premises in the long run); *Heir v. Delaware River Port Auth.,* 218 F.Supp.2d 627, 629 (D.N.J. 2002)("upon notice of the DRPA's condemnation, [the franchisor] was empowered to terminate, at its discretion, its franchise relationship with [the franchisee]").

Courts have denied summary judgment where the termination of the franchise was pretextual. *See Moz, Inc. v. Shell Oil Co.,* No. 85–C–9016, 1986 WL 3613, *3 (N.D.Ill. March 17, 1986) ("[franchisor] cannot use the condemnation exception to the PMPA's prohibition on termination as a pretext for terminating a dealer which it wants to terminate for other reasons such as replacing a dealership with a company-owned minimart.")

### 2. Condemnation Under Virginia Law

█ Although Federal law creates the framework for termination of a franchise,

the question of whether a "condemnation or other taking" occurred is controlled by state law. In Virginia, condemnation proceedings officially begin with the filing of a Petition of Condemnation. Va.Code. Ann. § 25.1–205. The filing of a condemnation certificate initiates the Commonwealth's ownership interest in the subject property. *Commonwealth Transp. Comm'r of Va. v. Klotz*, 245 Va. 101, 425 S.E.2d 508, 511 (1993). The Virginia condemnation statute, Va.Code Ann. § 33.1–122, provides that, once the Commissioner has filed a condemnation certificate in compliance with statutory requirements, the Commonwealth shall obtain defeasible title to the land described in the certificate. *Klotz*, 425 S.E.2d at 511. This section further provides that "[t]he title in the Commonwealth shall be defeasible until the reaching of an agreement between the Commissioner and such owner, as provided in § 33.1–129, or the compensation determined by condemnation proceedings as hereinafter provided." Va.Code Ann. § 33.1–122; *Klotz*, 425 S.E.2d at 511.

■ The Commonwealth Transportation Commission is empowered to obtain property necessary for the construction of public highways by purchase, gift, or through the power of eminent domain. Va.Code Ann. § 33.1–89. At the inception of the condemnation process, Va.Code Ann. § 25.1–204 requires that "[a] condemnor shall not institute proceedings to condemn property until a bona fide but ineffectual effort to purchase from the owner the property sought to be condemned has been made." The making of a bona fide offer to purchase the property is a jurisdictional condition precedent to a condemnation action. *State Highway & Transp. Comm'r*

of Va. v. Herndon, 225 Va. 380, 302 S.E.2d 55, 58 (1983). The purpose of this offer is to avoid "the trouble and possible expense of counsel fees . . . when a *bona fide* effort to purchase his land would in all probability terminate the transaction." *Charles v. Big Sandy & C.R. Co.*, 142 Va. 512, 129 S.E. 384, 385 (1925). This offer is only open prior to the filing of the condemnation certificate. *See Klotz*, 425 S.E.2d at 511.

■ A condemnation proceeding cannot commence until further negotiations with the property owner prove to be futile. The condemnor's efforts to purchase the property may become "ineffectual" within the meaning of the statute when "negotiations proceed far enough to indicate an impossibility of agreement." *Norfolk Redev. & Hous. Auth. v. Baylor*, 214 Va. 1, 197 S.E.2d 335, 337 (1973). The policy of the Commonwealth of Virginia, by requiring the state to attempt to purchase the property prior to condemnation, prefers the purchase of needed property to the exercise of the eminent domain power.[3]

*3. Sunoco's Termination of the Franchise*

■ Sunoco's first argument is that a condemnation action had been initiated by the Commonwealth's offer to purchase the property. Bajwa argues that the PMPA and the Agreement require the initiation of a formal condemnation action. Bajwa distinguishes *Halder, Rodriguez,* and *Heir* on the grounds that in those cases the state had filed the equivalent of a Petition of Condemnation. In Virginia, the condemnation process cannot begin without an attempt by the Commonwealth to purchase the property. *See Klotz*, 425 S.E.2d at 511

---

**3.** The Woodrow Wilson Bridge and Tunnel Authority is also authorized to purchase or condemn property. *See* Va.Code Ann. § 33.1–320.2(II:IV) (the "Woodrow Wilson Bridge and Tunnel Compact"). Likewise, the Authority is only empowered to condemn property when "a reasonable price cannot be agreed upon." *See id.*

("The only offer recognized within the statutory framework of condemnation is that which occurs *at the inception of the process*.") (emphasis added); *but see Bristol Redev. & Hous. Auth. v. Farmbest, Inc.,* 215 Va. 106, 205 S.E.2d 406, 408 (1974) ("The taking begins when the condemnation petition is filed."). The Court reads "condemnation" in the Agreement and the PMPA to mean the actual condemnation of property though a formal action with the court. Since the Virginia courts have described the making of an offer to purchase the property as a "jurisdictional condition precedent" and not the beginning of the condemnation action, the Court holds that no "condemnation" occured that would justify termination under the PMPA or the Agreement.

■ This holding does not end the inquiry. The Court must determine whether the sale of property to the Commonwealth when condemnation is imminent constitutes an "other taking" or, in the alternative, if Sunoco's actions were reasonable within the PMPA. As an initial matter of statutory construction, 15 U.S.C. § 2802(c)(5) and paragraph 3.06(a) of the Agreement must encompass more than just condemnation actions: The statute reads "condemnation *or other taking*." (emphasis added).

Bajwa concedes that a taking can occur without a formal eminent domain action. *See United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980) ("[i]nverse condemnation is 'a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'"). Bajwa argues that the word "taking" in the Agreement and the PMPA means a taking under the Fifth Amendment. Since

a *bona fide* offer to purchase property is not a "taking" under the Constitution, contends Bajwa, it cannot constitute an "other taking" within the meaning of the Agreement of PMPA.

The Court need not hold that a *bona fide* offer by the state to purchase property is a taking of constitutional proportions. Bajwa does not offer any support for the proposition that the phrase "other takings" was intended by the parties to the agreement or by Congress to mean a regulatory taking or an inverse condemnation action.

■ Bajwa's contention that Sunoco engaged in a voluntary sale to the Commonwealth is without merit. Examining the entire context of the transaction, it is apparent that the Commonwealth of Virginia intended to acquire the Property either by purchase or condemnation. (*See* Def. Ex. 2–5.) It is well established that sales to potential condemnors are involuntary sales and as such cannot establish the fair market value of comparable property. *United States v. 10.48 Acres,* 621 F.2d 338, 339 (9th Cir.1980) ("The price paid by a condemnor in settlement of condemnation proceedings or in anticipation of such proceedings is inadmissible to establish value of comparable land as 'such payments are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value'."); *United States v. 46,672.96 Acres,* 521 F.2d 13, 17 (10th Cir.1975) ("The general rule is that evidence of prices paid by the government for the purchase, through private negotiations, of lands in connection with the project for which land is being condemned cannot be received."); *Slattery Co. v. United States,* 231 F.2d 37, 41 (5th Cir.1956) ("This rule, based upon the view that such payments are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value, is the generally

prevailing rule in this circuit and elsewhere."); *Miss. State Highway Comm'n v. Taylor,* 293 So.2d 9, 10 (Miss.1974) ("Generally, sales of property made to agencies vested with the power of eminent domain cannot be used in eminent domain trials as comparable sales."); *State v. De Tienne,* 218 Mont. 249, 707 P.2d 534, 538 (1985) ("[W]e hold sales to condemnors are not admissible to establish fair market value when the sales are part of the same project which resulted in the condemnation of other property, however similar the property may be to that in controversy, and regardless of whether the payment was the result of a settlement, an award or a jury verdict."); *State v. Johnson,* 282 N.C. 1, 22, 191 S.E.2d 641, 655 (N.C.1972) ("It is our opinion that any sale to a prospective condemnor is highly unlikely to be a fair test of market value . . . ."); *In re City of Bethlehem Redevelopment Auth.,* 474 Pa. 75, 376 A.2d 641, 643 (1977) ("[S]ales to a condemnor are neither representative of nor probative of the comparable sales between a willing and informed buyer and a willing and informed seller.") (emphasis in original); *Gomez Leon v. State,* 426 S.W.2d 562, 565 (Tex.1968) ("Our courts have consistently held that proof of sales of property to a corporation or governmental entity having power of eminent domain is not admissible in a condemnation suit"); *see generally* 5 *Nichols on Eminent Domain* § 21.06 (3d ed.1997) (discussing the general rule that sales to condemning authorities are not admissible to establish fair market value).

In the instant case, the Court finds that Sunoco sold the property to the Commonwealth under the compulsion of an impending condemnation action. By January 8th, the condemnation of the property had become a fait accompli. (Def.Ex. 4.) Plaintiff conceded at oral argument that the Woodrow Wilson Bridge Project would not have been moved if Sunoco had fought the condemnation. If Sunoco had not agreed to sell the property, the Commonwealth would have begun the process of condemnation. (Def. Ex. 5 ("In order to assure that the property acquisition does not cause any delays in the construction contract, we will begin the process of acquiring title through eminent domain proceedings with the court.").) By agreeing to sell the property, Sunoco sought to avoid participation in what could have been a lengthy and expensive condemnation proceeding.

Were the Court to hold that a sale to a potential condemnor was not an "other taking," the PMPA would mandate that property owners reject any offer made by the state and insist that condemnation proceedings be initiated. Such a holding would conflict with both the goal of Va. Code Ann. § 25.1–204, *see Charles,* 129 S.E. at 385, and the interests of judicial economy. Furthermore, this case does not present a case of arbitrary or discriminatory termination that might offend the primary purpose of the PMPA—to protect pertoleum franchisees from arbitrary or discriminatory terminations. *See Mobil Oil Corp. v. Va. Gasoline Marketers & Auto. Repair Ass'n,* 34 F.3d 220, 223 (4th Cir.1994). The Court finds no evidence, as was present in the *Moz* case, of an ulterior motive on Sunoco's part in terminating Bajwa's franchise. Bajwa remained a franchisee until April 8, 2003 when the Commonwealth took possession of the property. Furthermore, Sunoco specifically stated that Bajwa could continue to operate the franchise if Virginia extended the taking date. (Def. Ex. 6 at 2.)

In the immortal words of Don Corleone, the Commonwealth made Sunoco "an offer it could not refuse." Since Sunoco's loss of the property was an inevitable result, the Court sees no reason to hold that Sunoco had to enter into condemnation proceed-

ings. Certainly, the element of compulsion that makes sales to potential condemnors unreliable as a measure of valuation was present in this sale as well. The Court holds that the sale of property to the potential condemnor, where it would have otherwise obtained the property through eminent domain, constitutes an "other taking ... pursuant to the power of eminent domain" under 15 U.S.C. § 2802(c)(5) and the Agreement between the parties.[4]

## B. Apportionment of the Sale Price Under Virginia Law

The Court has already determined that a condemnation did not occur. Sunoco, however, cannot claim that the sale was the functional equivalent of a condemnation, and, at the same time, maintain that the sale price is not legally the same as a condemnation award. Accordingly, the Court will treat the sale price paid to Sunoco as a condemnation award under Virginia law.

Bajwa argues that under Virginia law, he is entitled to a portion of the amount paid to Sunoco, constituting his loss of his leasehold interest. The Defendant contends that the moneys paid by the state are for the real estate value alone. Furthermore, Sunoco relies upon the waiver contained in paragraph 3.06 of the agreement, which states that Bajwa is not entitled to "to any portion of a condemnation award payable" to Sunoco.

 The parties do not dispute that Bajwa is not entitled to any compensation for loss of goodwill or profits. Under Virginia law, condemnation awards do not include loss of goodwill or loss of profits. *State Highway & Transp. Comm'r of Va. v. Lanier Farm, Inc.*, 233 Va. 506, 357 S.E.2d 531, 533 (1987). Lessees of property, however, are entitled to compensation for the value of their leasehold interest. *Exxon Corp. v. M & Q Holding Corp.*, 221 Va. 274, 269 S.E.2d 371 (1980); *Lamar Corp. v. City of Richmond*, 241 Va. 346, 402 S.E.2d 31, 34 (1991)(stating that once title to the property passes to the condemnor, the lessee becomes entitled to a share of the total award and to a subsequent proceeding to determine the appropriate amount of that share). When the condemned property is subject to a lease, the value of the lessee's interest should first be determined and deducted from the award, and the balance then allocated to the landowner. *Exxon*, 269 S.E.2d. at 375.

Sunoco contends that Bajwa waived his rights to any part of the compensation. Sunoco relies on the paragraph 3.06(b) of the Agreement:

Dealer shall have no claim to any portion of a condemnation award payable to Company arising from any such taking or from damages to Premises resulting therefrom however Dealaer may be entitled to any separate award payable to Dealer for taking of Dealer's leasehold interest, loss of business opportunity, or goodwill.

(Def. Ex. 1 at 13.) Bajwa responds by claiming that any purported waiver under paragraph 3.06 of the Agreement violates 15 U.S.C. § 2805(f), because it requires the franchisee to surrender his rights under state law.[5]

---

4. Assuming *arguendo* that the sale of the property did not constitute a taking under 15 U.S.C. § 2802(c)(5), the Court holds that Sunoco acted reasonably in terminating Bajwa's franchise. Sunoco gave Bajwa notice as required by the PMPA and allowed Bajwa to continue operating the franchise until the date the Commonwealth obtained title to the property.

5. 15 U.S.C. § 2805(f) reads as follows:
 (f) Release or waiver of rights
 (1) No franchisor shall require, as a condition of entering into or renewing the fran-

Courts have upheld waivers of condemnation awards similar to the one in this case. In *State by Comm'r of Transp. v. Hess Realty Corp.*, a New Jersey court held that although a franchise holder might well be entitled to participate in allocation proceedings to obtain a share of the award, the plaintiff had, as part of its agreement, contracted away any right to share in the compensation award. 226 N.J.Super. 256, 543 A.2d 1050, 1053 (1988); *see also Jersey City Redevelopment Agency v. Exxon Corp.*, 208 N.J.Super. 53, 504 A.2d 1207 (1986)(upholding a contractual waiver of condemnation award).

The Court, however, does not need to reach the issue of whether the Agreement's waiver provision violates 15 U.S.C. § 2805(f). The Agreement between Bajwa specifically states that Bajwa did not waive any right to a separate award for the taking of the leasehold interest. (Def. Ex. 1 at 13.) Furthermore, the option Sunoco granted the Commonwealth specifically states:

> The landowner further agrees that he will compensate the tenant(s) of said land for his/her interests and any and all legally compensable damages said tenant(s) may suffer and sustain by reason of the conveyance agreed to hereunder and by reason of the said proposed construction, and agrees to save the Commonwealth harmless from any and all claims that may be made by said tenant(s) for taking and /or damaging of property by reason of such conveyance and/or construction."

(Def. Ex. 7 at 2.) Sunoco claims that this provision is merely an indemnification agreement and does not entitle Bajwa to any compensation.

Sunoco is correct that the option does not confer upon Bajwa any substantive rights. It does, however, require Sunoco and not the Commonwealth to compensate Bajwa for any value of the leasehold interest, presumably from the sales price. Given the language in the option it is unclear whether the sales price included compensation for Bajwa's leasehold interest. Bajwa, under the contract, would only be entitled to a *separate* award, but since the sale was prior to any in court condemnation proceeding, the Court cannot determine whether the award includes compensation for Bajwa's lease. Accordingly, the Court holds that there are genuine issues of material fact as to (1) the inclusion of the value of Bajwa's leasehold interest in the sale price of the property; and (2) the value of that leasehold interest.

## IV. Conclusion

For the foregoing reasons, the Court will grant the Defendant's motion for summary judgment in part and deny it in part and deny the Plaintiff's motion for summary judgment. An appropriate order will issue.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

(1) Defendant's Motion for Summary Judgment is GRANTED in part, with respect to the issue of whether it wrongfully terminated Plaintiff's franchise;

(2) Defendant's Motion for Summary Judgment is DENIED in part, with respect to (1) the inclusion of the value of

---

chise relationship, a franchisee to release or waive-
(A) any right that the franchisee has under this subchapter or other Federal law; or

(B) any right that the franchisee may have under any valid and applicable State law.

Bajwa's leasehold interest in the sale price of the property; and (2) the value of that leasehold interest;

(3) Plaintiff's Motion for Partial Summary Judgment is DENIED;

(4) The Clerk of the Court shall forward copies of this Order to all counsel of record.