AMERICAN PETROLEUM INSTI-TUTE, and National Petrochemical and Refiners Association, Plaintiffs,

v.

Roy A. COOPER, III, Attorney General of the State of North Carolina, Defendant,

and

North Carolina Petroleum and Convenience Marketers Association, Intervenor–Defendant.

No. 5:08–CV–396–FL.

United States District Court, E.D. North Carolina, Western Division.

Jan. 26, 2010.

Burley Bayard Mitchell, Pressly M. Millen, Jr., Womble Carlyle Sandridge & Rice, PLLC, Raleigh, NC, for Plaintiffs.

Mark Allen Davis, North Carolina Department of Justice, Raleigh, NC, for Defendant.

A. Bartlett White, Hatch Little & Bunn, LLP, Charles F. Marshall, III, Eric M. David, Brooks, Pierce, McClendon, Humphrey and Leonard, LLP, Raleigh, NC, for Intervenor Defendant.

## ORDER

LOUISE W. FLANAGAN, Chief Judge.

This matter comes before the court on cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 (DE## 10, 42, 44). For the following reasons, the court denies plaintiffs' motion for summary judgment, and grants corresponding motions filed on behalf of defendant and intervenor-defendant.[1]

## STATEMENT OF THE CASE

American Petroleum Institute ("API"), a national trade association of approximately 400 corporate members that represents America's oil and natural gas industry, and National Petrochemical and Refiners Association ("NPRA"), a non-profit trade association that represents American refiners and petrochemical manufacturers, seek declaratory and injunctive relief allowing their members to retain the ability to sell only ethanol-blended gasoline to distributors and retailers in North Carolina, notwithstanding the prohibitions in the North Carolina Act of July 14, 2008 ("Ethanol Blending Statute"), 2008 N.C. Sess. Laws 222, signed into law August 17, 2008.[2]

---

1. The court notes also as pending plaintiffs' motion for leave to file certain documents under seal (DE # 46) and intervenor-defendant's motion for a hearing on the parties' cross-motions for summary judgment (DE # 58). Motion lodged on the docket at entry number 46 references plaintiffs' request to file under seal two examples of agreements between refiners and distributors "in order to provide background and to provide context for the legal issues before the Court on Plaintiffs' Motion for Summary Judgment." Defendant's response in opposition, reporting also the intervenor-defendant's opposition to same, dwells on a violation of the spirit of the parties' agreement concerning certain stipulations. Without more, the court ALLOWS plaintiffs' motion to file under seal; however, the court notices here that it places no reliance on these agreements in its consideration of plaintiffs' motion for summary judgment. This commercial information is not relevant to the matters to be decided. Also without more, motion lodged on the docket at entry number 58, is DENIED.

2. The Ethanol Blending Statute provides in relevant part: "A supplier that imports gasoline into the State shall offer gasoline for sale to a distributor or retailer that is not pre-blended with fuel alcohol and that is suitable for subsequent blending with fuel alcohol." N.C. Gen.Stat. § 75–90(b) (2008). It also provides:

> The General Assembly finds that use of blended fuels reduces dependence on imported oil and is therefore in the public interest. The General Assembly further finds that gasoline may be blended with fuel alcohol below the terminal rack by distributors and retailers as well as above the terminal rack by suppliers and that there is no reason to restrict or prevent blending by suppliers, distributors, or retailers. Therefore, any provision of any contract that would restrict or prevent a distributor or retailer from blending gasoline with fuel alcohol or from qualifying for any federal or State tax credit due to blenders is contrary to public policy and is void. This subsection does not impair the obligation of

Plaintiffs contend that the Ethanol Blending Statute is preempted by several federal statutes and violates the Commerce Clause of the United States Constitution.

Motion for summary judgment was made in the case October 2, 2008, on behalf of plaintiffs, soon after complaint was served. This was responded to in the form of the defendant's motion for discovery, around which time, in October 2008, the North Carolina Petroleum and Convenience Marketers Association ("NCPCMA"), a statewide trade organization composed of approximately 300 businesses engaged in the marketing of petroleum and convenience products, sought leave to intervene as a defendant.

Over plaintiffs' objection, the court granted NCPCMA's motion February 27, 2009. Hearing was set on the motion for discovery in March and continued upon request. At hearing April 15, 2009, the parties negotiated a joint submission of certain factual stipulations for the court's reference in deciding plaintiffs' motion for summary judgment, entered in the record April 22, 2009.[3] Agreement as to a briefing schedule also was reached. In light of these agreements, defendant's motion for discovery was denied as moot.

In light of the stipulations, plaintiff refined its motion through the form of a revised memorandum, entered in the record May 8, 2009, wherein it is argued that the Ethanol Blending Statute conflicts with multiple federal statutes, as well as the Commerce Clause. Defendant has also moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, in motion filed May 22, 2009, as to all claims asserted by plaintiffs alleging that the Ethanol Blending Statute is facially preempted by federal law or facially violates the Commerce Clause. In addition, to the extent it is determined that plaintiff's complaint also states an as-applied challenge, which defendant expressly denies, defendant moves for dismissal of such a claim pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, based on ripeness grounds. Intervenor-defendant similarly asserts in motion made pursuant to Rule 56 of the Federal Rules of Civil Procedure, filed May 22, 2009, that plaintiffs' facial challenges fail as a matter of law. Briefing concluded June 18, 2009. In order entered June 24, 2009, the court denied motion for leave to file statement of *amicus curiae* by the Petroleum Marketers Association of America ("PMAA"), a national organization to which intervenor-defendant belongs. September 29, 2009, the court received the parties' clarification of the effect of the stipulation, request in order entered September 21, 2009.

## STATEMENT OF THE UNDISPUTED FACTS

The parties stipulate to certain facts deemed binding on plaintiffs for purposes of the court's consideration of plaintiffs' motion for summary judgment, including that the Ethanol Blending Statute has not (1) prevented plaintiffs' members from complying with various federal obligations; (2) resulted in consumer confusion or lowered the quality of trademarked gasoline; (3) caused excessive burden on interstate commerce in relation to local benefits provided by the law; or (4) precluded any of plaintiffs' members from selling gasoline in North Carolina. The court is to take the stipulations into account when deciding plaintiffs' motion, but to disregard them for purposes of considering any opposing motion for summary judgment. The par-

---

existing contracts, but does apply if such contract is modified, amended, or renewed. *Id.* § 75–90(c) (2008).

3. Pursuant to this court's order, parties filed a clarifying amendment to the stipulations on September 29, 2009.

ties have agreed that "these stipulations will enable the Court to determine which, if any, of the substantive issues contained in the Complaint require further factual development before they can be resolved," but that, "[i]n the event the Court denies both parties' Motions for Summary Judgment on a particular claim (or claims), the ... [s]tipulations ... will not apply to any further litigation on said claim(s)." (J. Stipulations 1; Am. J. Stipulations 1.)

The stipulations clarify that certain claims are not being raised for the purpose of summary judgment, because the parties agree that further discovery will be necessary on related issues.[4]

Finally, the parties agree that for the purpose of summary judgment, plaintiffs' claims are to be deemed to constitute a facial challenge to the Ethanol Blending Statute. Plaintiffs imply that the complaint also raises as-applied challenges. Defendants, on the other hand, contend that the complaint mounts only a facial attack against the statute and that any as-applied challenge would not yet be ripe. The court addresses only those facial challenges specifically at issue in the motions for summary judgment. Because the court as herein set forth denies plaintiffs' motion for summary judgment, remaining facial and as-applied challenges are subject to further litigation.[5]

**DISCUSSION**

**A. Standing**

The court first addresses whether plaintiffs have standing to bring this action.[6] In its answer to the complaint, defendant suggests that "some or all of [p]laintiffs' claims are barred by the doctrine of standing." (Answer 10.) Neither defendant or intervenor-defendant, however, presses the issue of standing in any motion for summary judgment. Regardless of whether they wish now to pursue this, the court is "obliged to examine the standing of [plaintiffs], as a matter of the case-or-controversy requirement...." *Juidice v. Vail,* 430 U.S. 327, 331, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *see Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216, 1221 (4th Cir.1980) ("[W]hether raised or not, jurisdictional standing is an issue to be considered *sua sponte* by the court....").

■ Plaintiffs claim associational standing to bring suit on behalf of their members. Associational standing requires a showing that (1) at least one individual member has standing to sue in its own right; (2) the interests the organization seeks to protect are germane to its purposes; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *Retail In-*

**4.** Specifically, the parties do not seek the court on the record before it now to decide (1) whether the Ethanol Blending Statute is preempted because it interferes with refiners' ability to ensure that their gasoline complies with federal law under the Reid Vapor Pressure standards; (2) whether the statute is preempted because it interferes with the federal objective of allowing obligated parties to satisfy their renewable fuel requirements as efficiently as possible; (3) whether the statute is preempted because addition of ethanol to gasoline is "willful adulteration, mislabeling, or misbranding of motor fuels or other trademark violation" under the PMPA; or (4) whether the statute violates the Commerce

Clause by discriminating in favor of local businesses or imposing a burden excessive in relation to putative local benefits.

**5.** The court need not reach defendant's motion for dismissal of any as-applied challenge pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction based on ripeness grounds. Said motion is DISMISSED as MOOT.

**6.** As envisioned in the parties' joint stipulations, the court has considered the declarations of Michele Rinn, Gregory M. Scott, and Al Mannato in determining whether plaintiffs possess standing to bring this action.

*dus. Leaders Ass'n v. Fielder,* 475 F.3d 180, 186 (4th Cir.2007) (citations omitted). An individual member has standing to sue in its own right if it is able to allege an "(1) injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision." *Id.* at 186 n. 1 (citations omitted).

■ Each of the three prongs for individual standing is met here. Plaintiff alleges that there is "a realistic danger [its members will] sustain [ ] a direct injury as a result of the statute's operation or enforcement." *See Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). The impending injuries have been described as (1) the sanctions which may be imposed by state and federal authorities for failure to comply with conflicting legal regimes; (2) the interference with their members' federal trademark rights; and (3) the increased burden on out-of-state members. *See Retail Indus.,* 475 F.3d at 186 ("[T]he alleged injury must, for standing purposes, be concrete and particularized ... [b]ut ... [i]f the injury is certainly impending, that is enough.") (internal quotations and citations omitted). As Attorney General, defendant is charged with investigating violations of and enforcing the Ethanol Blending Statute. N.C. Gen.Stat. § 75–85 (2008). An injunction from this court would provide redress to plaintiffs' members.

Therefore, at least one of plaintiffs' members has standing to sue in its own right. Furthermore, the interests raised by this litigation are germane to plaintiffs' purposes as trade associations, and the participation of individual members is not required for successful adjudication. Plaintiffs have satisfied the requirements for associational standing.

**B. Cross–Motions for Summary Judgment**

**1. Standard**

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

**2. Preemption**

Plaintiffs contend that the Ethanol Blending Statute is preempted by several federal statutes and violates the Commerce Clause of the United States Constitution. Defendant meets this challenge in the form of a motion for summary judgment as to all claims asserted by plaintiffs alleging that the Ethanol Blending Statute is facially preempted by federal law or facially violates the Commerce Clause. Intervenor-defendants similarly assert, on motion made pursuant to Rule 56 of the Federal Rules of Civil Procedure, that plaintiffs' facial challenges fail as a matter of law.

■ Under the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, there are three scenarios in which a state law will be preempted by federal law. *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). First, Congress may expressly preempt state law by explicitly stating its intention to do so. *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir.1997) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)). Second, Congress can impliedly preempt state law by regulating so pervasively in a particular field that there is no room left for the states to supplement federal law. *Id.* (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)). Finally, a state law is preempted to the extent it actually conflicts with federal law, either because compliance with both laws is impossible or the state law interferes with the accomplishment of Congressional objectives or the methods chosen for meeting those objectives. *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 596 (4th Cir. 2005) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 103, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992); *S. Blasting Servs., Inc. v. Wilkes County, N.C.*, 288 F.3d 584, 591 (4th Cir.2002)).

Plaintiffs rely on the first and third theories in contending that three federal laws or programs preempt the Ethanol Blending Statute. First, plaintiffs allege the Ethanol Blending Statute stands as an obstacle to the objectives and methods of the federal renewable fuel program, 42 U.S.C. § 7545(*o*), because it interferes with refiners' choice under the federal program of whether to blend renewable fuels themselves or purchase credits from an entity that does in order to meet federal renewable fuel requirements. Second, plaintiffs allege that the Ethanol Blending Statute conflicts with the federal Lanham Act, 15 U.S.C. § 1051 *et seq.*, by forcing refiners to cede control over the manufacturing of their trademarked products. Finally, plaintiffs allege that the federal Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.*, expressly preempts the Ethanol Blending Statute because it prohibits states from enacting laws imposing restrictions on termination and non-renewal of franchise agreements beyond those created by federal law.

At the onset, it is helpful to identify basic principles which guide the court's analysis. First, "determining whether a federal statute preempts a state statute ... is a constitutional question." *Bell Atlantic Md., Inc. v. Prince George's County*, 212 F.3d 863, 865 (4th Cir.2000) (citation omitted). That "determination is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (quoting *Perez v. Campbell*, 402 U.S. 637, 644, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971)) (internal quotation marks omitted).

Second, in determining the construction of the federal and state statutes at issue, this court is obliged to attempt to harmonize them if reasonably possible. *See Anderson v. Babb*, 632 F.2d 300, 308 (4th Cir.1980) ("[It is] constitutional commonplace that a court should avoid, if possible, that construction of a statute that would result in its constitutional invalidation.") (citations omitted); *see also Unocal Corp. v. Kaabipour*, 177 F.3d 755, 769 (9th Cir. 1999) (noting "the respectful approach of generally interpreting and applying legislation by harmonizing state and federal statutes where possible so as to avoid finding preemption"). In interpreting a state statute, the court should construe it in a way that avoids constitutional infirmity if

possible. *See Planned Parenthood of Blue Ridge v. Camblos*, 155 F.3d 352, 383 (4th Cir.1998) (en banc): *see also Harris v. United States*, 536 U.S. 545, 555, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) ("[W]hen a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the court's] duty is to adopt the latter.") (quotations omitted). Similarly, when interpreting a federal statute, there is a presumption that Congress did not intend to supplant state law. *College Loan Corp.*, 396 F.3d at 597.

Third, "[t]he existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute." *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982); *see also United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 669 (4th Cir.1996) (quoting *Rice*). Thus, plaintiffs may "successfully enjoin the enforcement of [the] state statute only if the statute on its face irreconcilably conflicts with federal ... policy." *Id.*; *see also Anderson v. Edwards*, 514 U.S. 143, 155 n. 6, 115 S.Ct. 1291, 131 L.Ed.2d 178 (1995) ("[B]ecause respondents challenged the [state law] on its face by seeking to enjoin its enforcement altogether, ... they could not sustain their burden even if they showed that a possible application of the rule (in concert with another statute or regulation) violated federal law.") (citations omitted); *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987) ("[Plaintiff] argued that any state permit requirement, whatever its conditions, was *per se* pre-empted by federal law. To defeat [this] facial

challenge, the [state] needed merely to identify a possible set of permit conditions not in conflict with federal law.").

Finally, if there is no interpretation but that the Ethanol Blending Statute impermissibly conflicts with federal law or is expressly preempted, it is invalidated only to the extent of that conflict. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 258, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) ("[I]t appears likely that at least certain aspects of the [state law rules] are pre-empted[,] ... [but] does not necessarily follow ... that [they] are pre-empted *in toto*."); *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476, 116 S.Ct. 1063, 134 L.Ed.2d 115 (1996) ("[S]tate law is displaced only to the extent it actually conflicts with federal law."). Plaintiffs' claim of preemption as to the Lanham Act applies only to sales of branded gasoline. Similarly, their PMPA claim also applies only to sales of branded gasoline in a relationship governed by the PMPA. The parties agree that, if either of these statutes preempts the Ethanol Blending Statute, it does so only as to the sale of statutorily-covered gasoline.

### a. Federal Renewable Fuel Program

■ Plaintiffs first argue that the Ethanol Blending Statute creates an obstacle to the accomplishment and execution of the objectives of the federal renewable fuel program and the methods Congress has chosen to achieve them.[7] Specifically, plaintiffs contend that the Ethanol Blending Statute stands as an obstacle both to Congress's goal of increasing renewable fuel usage and to the flexible method Congress chose to give refiners to comply with renewable fuel production mandates.[8] For

---

7. "The term 'renewable fuel' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel." 42 U.S.C. § 7545(*o*)(1)(J). The "renewable

fuel" in question is ethanol, *not* the resulting blend of ethanol and gasoline.

8. Plaintiffs expressly disavow any argument based on inability to comply with both state and federal law.

the following reasons, the court finds that the Ethanol Blending Statute does not irreconcilably conflict with the federal program on its face.

### i. Objectives and implementation of the federal program

The uncontested and uncontroversial purpose of the renewable fuel program is "to ensure jobs ... [through] secure, affordable, and reliable energy" and "to move the United States toward greater energy independence and security" by "increas[ing] the production of clean, renewable fuels ...." Energy Policy Act of 2005, Pub.L. No. 109–58, 119 Stat. 594 (establishing renewable fuel program); Energy Independence and Security Act of 2007, Pub.L. No. 110–140, 121 Stat. 1492 (amending renewable fuel program). To that end, Congress created annual goals for renewable fuel usage, and directed the Environmental Protection Agency ("EPA") to create regulations that would "ensure that gasoline sold or introduced into commerce in the United States ... contains the applicable volume of renewable fuel determined [by that table]." 42 U.S.C. § 7545($o$)(2)(A)(i), (B). Congress also created the Volumetric Ethanol Excise Tax Credit ("VEETC"), which grants to entities that blend gasoline with ethanol a tax credit of forty-five (45) to fifty-one (51) cents per gallon of ethanol blended. 26 U.S.C. § 6426. Though technically separate from the "renewable fuel program" defined by 42 U.S.C. § 7545($o$), this tax credit works in tandem with that program by providing further economic incentive to blending.

In the renewable fuels program, Congress directed the EPA to create "compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the [production] requirements ... are met." 42 U.S.C. § 7545($o$)(2)(A)(iii)(I). Each year the EPA must determine what percentage of transportation fuel sold or introduced into commerce in the United States must be renewable fuel in order to meet the annual Congressional goal. *Id.* § 7545($o$)(3)(B). Each obligated party then is responsible for meeting that percentage in its own introduction of fuel into commerce. *Id.* Finally, Congress directed the EPA to create a program under which "any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required" receives credits for that excess amount which may be transferred to entities that do not meet their obligation. *Id.* § 7545($o$)(5).

To implement the program per Congress's instructions, the EPA mandates that each gallon of renewable fuel produced or imported be assigned a unique renewable identification number ("RIN"). Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 F.R. 23,900, 23,909 (May 1, 2007). The use of RINs allows the EPA "to measure and track renewable fuel volumes starting at the point of production rather than at the point when they are blended into conventional fuels," *id.* at 23,929, which the EPA found to be necessary because "a blender-based approach to tracking volumes of renewable fuel was inferior ...," *id.* at 23,-930. "Obligated parties are not required to physically blend the renewable fuel into gasoline or diesel fuel themselves. [Rather,] [t]he accumulation of RINs is the means through which each obligated party shows compliance with ... the renewable fuel standard." *Id.* at 23,932. Because of this, trading of RINs also fulfills the credit system envisioned by Congress. *See id.* at 23,908.

The EPA described its development of the program, which was meant to take into account the existing market structure of the fuel industry, as follows:

[The RJN system] was developed in light of the somewhat unique aspects of the [renewable fuel] program. [U]nder this program the refiners and importers of gasoline are the parties obligated to comply with the renewable fuel requirements. At the same time, refiners and importers do not generally produce or blend renewable fuels at their facilities and so are dependent on the actions of others for the means of compliance. Unlike EPA's other fuel programs, the actions needed for compliance largely center on the production, distribution, and use of a product by parties other than refiners and importers. In this context, we believe that the RIN transfer mechanism should focus primarily on facilitating compliance by refiners and importers and doing so in a way that imposes minimum burden on other parties and minimum disruption of current mechanisms for distribution of renewable fuels.

Our final program does this by relying on the current market structure for ethanol distribution and use and avoiding the need for creation of new mechanisms for RIN distribution that are separate and apart from this current structure. Our program basically requires RINs to be transferred with renewable fuel until the point at which the renewable fuel is purchased by an obligated party or is blended into gasoline or diesel fuel by a blender. This approach allows the RIN to be incorporated into the current market structure for sale and distribution of renewable fuel, and avoids requiring refiners to develop and use wholly new market mechanisms. While the development of new market mechanisms to distribute RINs is not precluded under our program, it is also not required. *Id.* at 23,937.

The EPA went on to address implementation of the RIN program as it relates to ethanol blending, starting:

In the case of ethanol blended into gasoline at low concentrations ($\leq$ 10 volume percent), stakeholders have informed us that a large volume of the ethanol is purchased by refiners directly from ethanol producers, and is then passed to blenders who carry out the blending with gasoline. Therefore, in many cases RINs assigned to renewable fuel will pass directly from the producers who generated them to the obligated parties who need them.

However, significant volumes of ethanol are also blended into gasoline without first being purchased by a refiner. In some cases, the blender itself purchases the ethanol. In other cases, a downstream customer purchases the ethanol and contracts with the blender to carry out the blending. Regardless, the ethanol may never be held or owned by an obligated party before it is blended into gasoline. Thus we are also requiring a blender to separate the RIN from the renewable fuel if he takes ownership of the renewable fuel and actually blends it into gasoline (or, in the case of biodiesel, into diesel fuel). This would only apply to volumes where the RIN had not already been separated by an obligated party. Since blenders will in general not be obligated parties under our program, blenders who separate RINs from renewable fuel will have no need to hold onto those RINs and thus can transfer them to an obligated party for compliance purposes or to any other party.

*Id.* at 23,942.

Under this system, obligated parties such as refiners are middle men who are expected neither to produce nor to blend renewable fuel themselves, though nothing in the program technically prohibits them from doing so. The only requirement of them is that they acquire RINs, *see* 40 C.F.R. § 80.1127, which the EPA deter-

mined would in almost all cases result from either gaining ownership of renewable fuel at some point in the distribution chain or trading for RINs on the market.

ii. Objectives and implementation
of the state statute

In enacting the Ethanol Blending Statute, the North Carolina General Assembly found "the use of blended fuels reduces dependence on foreign oil and is therefore in the public interest," N.C. Gen.Stat. § 75–90(c) (2008), suggesting a rationale that is not dissimilar from Congress's purpose in enacting the renewable fuel program. The language of the statute indicates that it was also meant to allow distributors and retailers in North Carolina to receive gasoline that is suitable for blending so that they might also participate in the federal renewable fuel program, which offers significant financial benefits to market participants. Defendants contend that, without the statute, it would be possible for suppliers to monopolize blending and thereby prohibit distributors and retailers from participating in the RIN-trading program or collecting the VEETC.

The state policy is implemented in two parts of the statute. First, suppliers that import gasoline into North Carolina are required to give distributors and retailers the option of purchasing gasoline that is not preblended with fuel alcohol and that is suitable for subsequent blending. N.C. Gen.Stat. § 75–90(b) (2008). Second, the statute voids any provision of any contract that would restrict or prevent a distributor or retailer from blending gasoline with fuel alcohol or from qualifying for any federal or state tax credit due to blenders. *Id.* § 75–90(c). Combining these two sections, suppliers must give distributors and retailers the option to both *buy* and *blend* unblended gasoline.

iii. The state statute does not stand as an obstacle to the federal goal of increasing usage of renewable fuels

The court first turns to plaintiffs' argument that the Ethanol Blending Statute stands as an obstacle to increasing use of renewable fuels by mandating that refiners sell unblended gasoline. Plaintiffs' argue that "[t]he objective ... for refiners to use more renewable fuels ... is advanced to the greatest extent when a refiner blends a renewable fuel such as ethanol into every gallon of gasoline that it blends[,][but][t]he Ethanol Blending Statute prevents a refiner from making that choice." (Pls.' Mem. Supp. Summ. J. 11.) They contrast the blending decision of refiners, which is mandated by Congress, with the blending decision of distributors and retailers, which is driven only by economic self-interest. Plaintiffs suggest that, if Congress could have achieved its objectives simply through a program of economic incentives, it would have had no need to adopt the renewable fuel program.

The court finds this argument unconvincing for a number of reasons. First, plaintiffs define Congress's objective too narrowly as increasing production of renewable fuels *by refiners*. In fact, Congress's goal was increasing production and usage of renewable fuels generally. Even more specifically, Congress's goal was to ensure that a statutorily set amount of renewable fuel be produced each year. While refiners are obligated to carry much of the burden for increasing renewable fuel usage to the level set by Congress, there is nothing in the federal program that suggests Congress wished to hinder other market participants from doing so as well. The RIN system described in detail above suggests as much.

Second, the Ethanol Blending Statute does not inhibit that part of Congress's

plan that applies exclusively to refiners, because it does not prohibit refiners from acquiring RINs to meet their obligations. Refiners are only one of many participants in the distribution chain, and the EPA's expectations in implementing the program that refiners would *not* be the ones blending strongly counsels against a finding of preemption simply because they will not be able to monopolize blending in North Carolina. There is nothing in the record to indicate that refiners will not be able to continue to blend gasoline to sell in North Carolina, but even more importantly, there is nothing in the record to indicate that individual refiners will no longer be able to meet their quotas or that market participants in the aggregate will fail to meet the goal set by Congress.

Third, though refiners blending ethanol into every gallon of gasoline they produce may be a more effective way of increasing renewable fuel production, Congress did not require refiners to do this. Instead, the legislation subjects refiners who obtain less than their allocated percentage of RINs to financial penalties while providing a financial gain for gasoline that is blended. Therefore, while the financial incentives may be stronger for refiners because they are also subject to fines, the program also contains substantial financial incentives to distributors and retailers. The Ethanol Blending Statute was enacted in part because these economic incentives are so strong, and there is nothing in the record to indicate that suppliers and distributors will act any differently from refiners in taking full advantage of these incentives. In fact, the RIN program established by the EPA assumes that the program will be driven in part by already existing market forces, and essentially requires distributors and retailers to be participants in the system.

iv. The state statute does not stand as an obstacle to the flexible method chosen by Congress to implement the federal program

The court next addresses plaintiffs' argument that the Ethanol Blending Statute stands as an obstacle to the flexibility of the Congressional program of renewable fuel mandates. Plaintiffs' define this flexibility as the option given to a refiner either to blend a certain amount of gasoline itself or to obtain credits from other entities that have blended. Plaintiffs allege that by requiring refiners to sell at least some unblended gasoline, the Ethanol Blending Statute effectively takes away this choice as to any particular amount of unblended gasoline required to be sold to local parties who have no similar obligation to choose between blending and purchasing credits. Plaintiffs rely on *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) and *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000), two cases in which the Supreme Court addressed preemption of state laws that interfered with flexible federal programs.

In *Fidelity*, a California law limited a lender's right to exercise a due-on-sale clause in a home loan to cases where the lender could demonstrate enforcement was necessary to protect against impairment to its security or risk of default. 458 U.S. at 148–49, 102 S.Ct. 3014. Federal law, by contrast, gave lenders the power to include due-on-sale clauses in their contracts with borrowers and to enforce those clauses at the lender's option. *Id.* at 146–47, 102 S.Ct. 3014. The Court found the California law preempted, finding it immaterial that federal law "simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions

when the security property is transferred." *Id.* at 155, 102 S.Ct. 3014. The Court noted that federal law "consciously has chosen not to mandate use of due-on-sale clauses because [it] desires to afford associations the flexibility to accommodate special situations and circumstances," while "California [law] forbid[s] a federal savings and loan to enforce a due-on-sale clause solely 'at its option' and ha[s] deprived the lender of the 'flexibility' given it by [federal law]." *Id.* (internal quotations and citations omitted) (first alteration in original).

In *Geier*, a District of Columbia woman sued her car's manufacturer when she was injured after she collided with a tree. 529 U.S. at 865, 120 S.Ct. 1913. She claimed the manufacturer had designed its car negligently and defectively because it lacked a driver's side airbag. *Id.* Federal law, however, required only a certain percentage of cars to be equipped with passive restraint systems, and even then allowed manufacturers to choose between different passive restraint systems rather than mandating airbags. *Id.* at 875–81, 120 S.Ct. 1913. In finding the state tort claim preempted, the Court concluded that "by its terms [it] would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors." *Id.* at 881. In doing so, the state tort claim "would have presented an obstacle to the variety and mix of devices that the federal regulation sought." *Id.* Furthermore, it would have "required all manufacturers to have installed airbags in respect to the entire District–of–Columbia–related portion of their ... new car fleet, even though [federal law] at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all." *Id.*

Plaintiffs' reliance on these two cases is misplaced. The flexibility inherent in *Fidelity* involved a federal policy that was exclusively intended to protect a lender's ability to elect to enforce due-on-sale clauses. 458 U.S. at 145–46, 102 S.Ct. 3014. The Federal Home Loan Bank Board ("Board") specifically addressed a number of adverse effects that followed from a lender's inability to include and enforce such clauses, *id.* at 146, 102 S.Ct. 3014, and the Court based its preemption decision on the fact that the state rule "limit[ed] the availability of an option the Board considers essential to the economic soundness of the thrift industry ...," *id.* at 156, 102 S.Ct. 3014. With the renewable fuel program, by contrast, the federal policy is not specifically aimed at protecting a refiner's ability or decision to blend. There is no mention of negative effects on the program of increasing renewable fuel usage if refiners do not blend gasoline themselves. The program does not even contemplate that refiners will perform any blending, and was specifically designed so that they would not have to do so.

In *Geier*, the flexibility stemmed from a specific "policy judgment that safety would be best promoted if manufacturers installed *alternative* protection systems in their fleets rather than one particular system in every car." 529 U.S. at 881, 120 S.Ct. 1913 (emphasis in original). The obligation to install passive restraint systems in ten percent (10%) of cars fell on car manufacturers alone, and a state tort claim for failure to install an airbag therefore directly impeded on choices—what restraint system to install and what models on which to install it—that were left solely to car manufacturers. With the renewable fuel program, by contrast, there is no explicit policy judgment that the increasing usage of renewable fuels depends on a program that gives incentives to refiners to craft a new blending framework. Quite the opposite, in fact. Furthermore, the "choice" of whether to blend is not left to refiners alone. Instead, the program expressly re-

lies on multiple actors for implementation, regardless of where the burden for non-compliance ultimately falls, and there is no showing that the Ethanol Blending Statute interferes with the interaction of these parties as envisioned by the EPA.

Underlying plaintiffs' preemption argument is an assertion that it is unfair for their members to bear the risk of penalties for failing to produce renewable fuels or to be required to buy credits for those who overproduce while being unable to monopolize the benefits created by the Congressional incentive program for such production. The relevant question for preemption analysis is not, however, which private parties benefit from the respective statutes, but rather whether the objectives or methods of the Congressional statute are interfered with by the state statute. Furthermore, the "flexibility" that the renewable fuel program envisions is manifestly *not* the flexibility for refiners to develop a system where they blend all of their gasoline with ethanol and sell only blended gasoline to distributors. As evidenced by the RIN program, the federal renewable fuel program does not contemplate the monopoly that plaintiffs are seeking, and plaintiffs have not shown that the Ethanol Blending Statute will interfere with Congress's objective to increase production of renewable fuels.

For these reasons, the court DENIES plaintiffs' motion for summary judgment premised on the argument that the Ethanol Blending Statute stands as an obstacle to the Congressional goals and flexibility of the federal renewable fuels program,

and ALLOWS defendant and intervenor-defendants' motions in corresponding part.

### b. Lanham Act

Next, plaintiffs argue that the Ethanol Blending Statute is preempted because it interferes with refiners' federal trademark rights. Specifically, plaintiffs contend that a refiner will be unable to control the quality of the products bearing its trademark because the Ethanol Blending Statute authorizes distributors and retailers to produce ethanol-blended gasoline bearing that trademark without the refiner's consent or oversight. For reasons that follow, the court declines to adopt such a broad reading of the Ethanol Blending Statute.[9]

The Lanham Act gives trademark owners the right to control the quality of goods associated with their marks. *See Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir.1994) ("[The sale of] [g]oods ... that do not meet the trademark owner's quality control standards ... constitute[s] trademark infringement.") (citations omitted). The Fourth Circuit first addressed the "quality control" aspect of trademark law in *Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir.1991). In that case, a wholesaler of bulk oil bought Shell Oil Co. ("Shell") oil from authorized distributors and resold it under the Shell trademark. *Id.* at 106. The wholesaler argued that it was permitted to do so because trademark law does not apply to the sale of genuine goods bearing a true mark. *Id.* at 107. The court disagreed, holding "[a] product is not 'genuine' unless it is manufactured and distributed under quality controls established by the manu-

9. Plaintiffs do not appear to argue that the Lanham Act expressly preempts the Ethanol Blending Statute, as opposed to implicitly preempting it under obstacle preemption. To the extent plaintiffs do make such an argument, it is unpersuasive in light of *Mobil Oil Corp. v. Va. Gas. Marketers & Auto. Repair Ass'n*, 34 F.3d 220, 226 (4th Cir.1994) (ex-

pressing doubts that the Lanham Act "expressly preempts any state law that erodes the quality control necessary for a mark owner to protect his trademark image," but finding in any case that a law is not expressly preempted where it does "not govern the appearance of, the ownership of, or the right to use franchisors' registered marks").

facturer." *Id.* (citations omitted); *see also United States v. Farmer,* 370 F.3d 435, 440–41 (4th Cir.2004) (holding that individual could be held criminally liable for infringing on trademark owner's right to control by affixing mark to shirts manufactured for, but rejected by, the mark's owner).

The wholesaler also argued that there was no actual confusion because its customers knew that it was not an authorized distributor of Shell oil. *Shell Oil,* 928 F.2d at 107–08. The court rejected this notion, holding that the touchstone of trademark infringement is the likelihood of confusion, not whether confusion actually occurs. *Id.* at 108. Based on the factual record developed by the district court, the Fourth Circuit agreed that the "use of Shell's marks was deceptive and likely to confuse consumers who rely on the trademarks as symbols of Shell quality." *Id.*

Relying on *Shell Oil,* the Fourth Circuit next decided *Mobil Oil Corp. v. Va. Gas. Marketers & Auto. Repair Ass'n,* 34 F.3d 220 (4th Cir.1994), in which it directly addressed a preemption argument not unlike plaintiffs' here. In that case, Mobil Oil Corp. ("Mobil") argued that a Virginia law was "inconsistent with its right of quality control [under the Lanham Act], because [the state law] prevent[ed] Mobil's effective regulation of the quality of goods and services sold in Mobil gas stations." *Id.* at 226. The court disagreed, holding that prohibitions on minimum hours, maximum stations, and quotas did not prevent Mobil from maintaining the quality of its products and services. *Id.* at 226–27. The court noted that twenty-four hour service was not an integral component of Mobil's trademark, that the number of stations a franchisee has did not have a "significant negative impact on Mobil's quality control efforts," and that the franchise agreement in question required the franchisee to "exercise the highest degree of care and diligence in the handling, storage and sale of all products delivered to the marketing premises, and protect the quality of those products." *Id.*

■ These cases establish that a federal trademark holder has the right to dictate and oversee quality control measures for the production and sale of its products and that a state law will be preempted if it interferes with a trademark owner's ability to engage in that quality control or creates a substantial likelihood of confusion. *See also Mariniello v. Shell Oil Co.,* 511 F.2d 853, 858 (3d Cir.1975) ("If state law would permit confusing or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal trademark holders, then the state law would, under the Supremacy Clause, be invalid."). Therefore, the only question for the court to decide is whether the Ethanol Blending Statute interferes with plaintiffs' members ability to engage in quality control or is otherwise substantially likely to lead to consumer confusion as to trademarked blended gasoline.

Plaintiffs' argument is premised on the Ethanol Blending Statute's statement that "any provision of any contract that would restrict or prevent a distributor or retailer from blending gasoline with fuel alcohol or from qualifying for any federal or State tax credit due to blenders is contrary to public policy and is void." Plaintiffs argue that the this language encompasses any effort by refiners to engage in quality control of the blending process, presumably because such quality control "restricts" distributors and retailers.

Defendant and intervenor-defendant offer different readings of the statute. Defendant asserts that nothing in the statute prevents franchisors from requiring compliance with their quality control procedures, and that the statute does not interfere with a refiner's ability to assert a

Lanham Act claim against an individual franchisee for failing to comply with such procedures. Alternatively, intervenor-defendant argues that there are quality control measures that would restrict blending and would therefore be disallowed by the statute, but that the statute does not in any case prevent quality control measures (such as testing by the trademark owner) *after* the fuel has been blended. Intervenor-defendant contends that this post-blending quality control is sufficient for Lanham Act purposes.

In the face of multiple possible meanings, the court finds helpful the Fourth Circuit's admonition in *Planned Parenthood of Blue Ridge v. Camblos,* 155 F.3d 352, 383 (4th Cir.1998) (en banc). In that case, the Fourth Circuit was asked to invalidate a newly enacted Virginia parental notification statute. It declined to do so, stating:

> [U]nder Virginia law, where a statute is susceptible to two interpretations, one of which would render the statute unconstitutional, the courts are required to interpret the statute so as to avoid its unconstitutionality. And as a federal court reviewing such a statute—especially a statute that has yet to be interpreted by the state courts because of federal court intervention before the statute's effective date—we would be obliged to assume that the state courts would follow not only the state's own law, but also the Constitution. As the Supreme Court also has frequently observed ..., the federal courts, as a matter of federalism and comity, should not sustain a facial challenge to a state statute that has yet to be construed by state courts, when a reasonable construction exists which would eliminate the constitutional infirmity.

*Id.* at 383.

North Carolina courts, like their counterparts in Virginia, are required to construe a statute to avoid its unconstitutionality. *See State v. Fowler,* 676 S.E.2d 523, 536 (N.C.Ct.App.2009) ("[R]eviewing courts 'are mandated to construe any legislative enactment so as to save its constitutionality, if possible, and to avoid a strict interpretation that will result in an absurd and unconstitutional result.'") (quoting *Cooke v. Futrell,* 37 N.C.App. 441, 444, 246 S.E.2d 65, 67 (1978)). Therefore, though the court is without the benefit of the state courts' interpretation of the Ethanol Blending Statute, it is "obliged to assume that [they] would follow not only the state's own law, but also the Constitution," *Planned Parenthood,* 155 F.3d at 383, so long as there is a reasonable construction of the statute that avoids constitutional problems.

With this admonition in mind, the court finds that the defendant's interpretation of the statute, which removes any alleged constitutional infirmities, is reasonable. The language of the Ethanol Blending Statute states that no contract may "restrict" or "prevent" blending or receipt of the related tax credit by distributors and retailers. To "prevent" unmistakably means "to deprive of power ... of acting" or "to keep from happening." *See* Webster's Third New International Dictionary 1798 (2002). Thus, refiners are not permitted to insert contractual provisions forbidding distributors and retailers to blend gasoline or to receive the federal tax credit for doing so. Given this unambiguous reading of "prevent," it is reasonable to read "restrict" in the same vein, meaning "to set bounds or limits to," "to check, bound, or decrease the ... scope or incidence of," or "[to] bar or carefully govern addition or increment to." *See id.* at 1937. When read as such, the statute does not allow refiners to limit distributors or retailers to a predetermined amount of blending by, for example, setting blending quotas, or to require them to forego or

share with refiners a set percentage of the tax credit. The statute therefore appears concerned with restrictions on *quantity* of blending (and the resulting amount of the related federal tax credit) rather than on *quality* of blending.

Under this construction of the statute, plaintiffs' members may continue to engage in quality control over the blending of their trademarked gasoline. They may set forth specific guidelines for blending and require random testing of the resulting blended gasoline, though they are not necessarily limited to these measures. For sales of gasoline outside a franchise agreement or to buyers unwilling to submit to or diligently follow their quality control procedures, suppliers may forbid use of the trademarked name as to the subsequent sale of the blended gasoline and bring suit under the Lanham Act where such unauthorized use occurs. Because they maintain the ability to engage in quality control and bring suit to enforce their trademarks, plaintiffs cannot contend that consumer confusion is likely to occur.

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED, and defendant's and intervenor-defendants' cross-motions for summary judgment are ALLOWED as to the Lanham Act preemption claim.[10]

### c. Petroleum Marketing Practices Act ("PMPA")

■ Finally, plaintiffs argue the PMPA's express preemption of state laws imposing restrictions on termination and non-renewal of franchise agreements beyond those created by federal law applies to the Ethanol Blending Statute with regards to sales of branded gasoline. The relevant preemption language cited by plaintiffs is as follows:

To the extent that any provision of this subchapter applies to the termination ... of any franchise, or to the nonrenewal ... of any franchise relationship, no State or any political subdivision thereof may adopt, enforce, or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination ... of any such franchise or to the nonrenewal ... of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a)(1). Plaintiffs contend that this language preempts the Ethanol Blending Statute because it would be permissible under the PMPA, but not the Ethanol Blending Statute, for a refiner to terminate or decline to renew a franchise agreement for unauthorized blending. For the reasons that follow, the court disagrees and concludes that the PMPA does not expressly preempt the Ethanol Blending Statute.

In *Mobil Oil*, 34 F.3d 220, the Fourth Circuit addressed the preemptive effect of the PMPA on a Virginia statute containing prohibitions on, *inter alia*, sales quotas and minimum hours of operation in franchise contracts. The court held that regulation of substantive contract provisions was indistinguishable from direct regulation of termination and renewal where the former "narrows the grounds for termination available to franchisors" or "provides franchisees with a remedy for termination not 'the same as' those set forth in the PMPA ... because certain terms and conditions prohibited by [the state law] are allowed by the PMPA." *Id.* at 224–25. The court found that the Virginia statute

---

**10.** Nothing in this order, however, should be taken to prohibit plaintiffs' members from bringing individual infringement claims against franchisees who refuse to abide by contractual quality control provisions in the future.

narrowed the grounds for termination because "[u]nder the PMPA, if contractual terms are reasonable and material, a franchisee's failure to comply with them is legitimate grounds for termination." *Id.* at 224 (citing 15 U.S.C. § 2802(b)(2)(A)). The court was unwilling to find that the sales quotas and minimum hours of operation terms prohibited by the Virginia law "would in all circumstances be unreasonable and immaterial," *id.*, and held the Virginia statute to be preempted., *id.* at 226.

Plaintiffs urge that this case is squarely on point with *Mobil Oil.* They contend that the Ethanol Blending Statute, like the Virginia statute at issue in *Mobil Oil,* regulates substantive contract provisions in a way that is indistinguishable from direct regulation of termination and renewal because the Ethanol Blending Statute expressly forbids franchisors from including contract provisions preventing blending, and applies when such contracts are modified, amended or renewed. They contend that contractual provisions preventing blending are reasonable and material, and that the failure of a franchisee to is legitimate grounds for termination under the PMPA but not under the Ethanol Blending Statute.

Under the PMPA as it existed when *Mobil Oil* was decided, plaintiffs' argument would have merit. However, shortly after the Fourth Circuit's decision in *Mobil Oil,* Congress amended the PMPA by adding 15 U.S.C. §§ 2801(13)(C) and 2805(f)(1)(B). *See* Petroleum Marketing

Practices Act Amendments of 1994, Pub.L. No. 103–371, §§ 4, 6, 108 Stat. 3484, 3485, 3486. Section 2801(13)(C) excludes "any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State" from the definition of "failure." Section 2805(f)(1)(B) states that "[n]o franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive ... any right that the franchisee may have under any valid and applicable State law."

In light of these new amendments, which demonstrate a Congressional intent not to preempt certain state laws, the reasoning of *Mobil Oil* does not compel a finding of preemption in this case.[11] Under *Mobil Oil,* this court must ask whether the Ethanol Blending Statute, which regulates the substantive provisions of franchise contracts, "narrows the grounds for termination available to the franchisor." In finding preemption of the Virginia law, the court in *Mobil Oil* relied on a provision in the PMPA which allows a franchisor to terminate or nonrenew for "a failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship . . . ." 15 U.S.C. § 2802(b)(2)(A). The amendments, however, clarify that "failure" to comply with a provision of the franchise does not include "any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State." 15 U.S.C. § 2801(13)(C). The Ethanol Blend-

---

**11.** Both sides point to legislative history to mount conflicting arguments as to what effect Congress intended the amendments to have. As the Fourth Circuit itself noted in *Mobil Oil,* "[t]he plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." 34 F.3d at 225 (citations and quotations omitted) (alteration in original). The plain meaning of the PMPA, as amended, is that a franchisor cannot terminate or non-renew a franchise based on a franchisee's failure to comply with contract provisions where the provision is illegal or unenforceable under state law. This court will "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).

ing Statute, which makes provisions forbidding blending illegal and unenforceable under North Carolina law, therefore falls outside the purview of § 2802(b)(2)(A).

Plaintiffs explain these amendments by arguing that a provision of a franchise agreement is "illegal or unenforceable" only if the state law at issue is not itself preempted. Under plaintiff's reading of the statute, (1) a state law is preempted if it narrows the grounds for termination; (2) failure to comply with a franchise provision is grounds for termination unless the provision is unenforceable or illegal under state law; and (3) a state law making a franchise provision unenforceable or illegal is valid only if it is not preempted. This circular analysis effectively reads the amendments out of the statute. The plain meaning of the amendments, to which the court is obligated to give force, is that states have the authority to pass substantive laws making certain franchise provisions illegal or unenforceable. Therefore, the PMPA does not preempt the Ethanol Blending Statute on the grounds that the statute's ban on any contract provision that restricts or prevents a franchisee from blending gasoline with fuel alcohol is contrary to the provision of the PMPA allowing termination for failure to comply with reasonable contract provisions.

As such, plaintiffs' motion for summary judgment is DENIED. Defendant and intervenor-defendants' cross-motions for summary judgment are ALLOWED as to plaintiffs' claim for preemption based on failure to comply with reasonable contractual provisions because, as a matter of law, the PMPA's express preemption language does not encompass the Ethanol Blending Statute.[12]

### 3. Dormant Commerce Clause

In addition to their preemption arguments, plaintiffs contend that the Ethanol Blending Statute is unconstitutional because it violates the Commerce Clause of the Constitution, U.S. Const. art. I, § 8, cl. 3. They assert that the Ethanol Blending Statute facially discriminates against interstate commerce by imposing an obligation to sell unblended gasoline only on suppliers that import gasoline into North Carolina, but not on suppliers that purchase gasoline within the state. For the following reasons, the court is constrained to reject this final constitutional argument as well.

The Commerce Clause "has long been understood to have a 'negative' [or 'dormant'] aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).[13]

---

**12.** Plaintiffs' motion for summary judgment urges this court to hold as a matter of law that the Ethanol Blending Statute narrows the grounds for termination or nonrenewal, *see* 15 U.S.C. § 2806(a)(1), because a franchisor will no longer be able to terminate for "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee." *see* 15 U.S.C. § 2802(b)(2)(C), (c)(10). Given the stipulations discussed in detail *supra,* the court determines the issue of "willful adulteration," which was not fully and adequately briefed by the parties, is not now before it.

**13.** The purpose of the dormant Commerce Clause is to prevent "a trade barrier to the free flow of goods, materials, and other articles of commerce across state lines...." *Brown,* 561 F.3d at 363. As such, "[t]he paradigmatic example of a law discriminating against interstate commerce is the protective tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in State." *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 193, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994). Perhaps because such tariffs are "so patently unconstitutional," the majority of facial discrimination cases involve "state laws that as-

Discrimination in this context means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Beskind v. Easley*, 325 F.3d 506, 514 (4th Cir.2003) (quoting *Or. Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345). A state law that discriminates against interstate commerce on its face, in its practical effect, or in its purpose is "virtually *per se* invalid." *Or. Waste Sys.*, 511 U.S. at 99, 114 S.Ct. 1345 (citing *Chem. Waste Mgmt. Inc. v. Hunt*, 504 U.S. 334, 344 n. 6, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)); *see also Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir.1996). To survive the challenge, the state must demonstrate that the law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." [14] *Granholm v. Heald*, 544 U.S. 460, 489, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)); *see also Brown v. Hovatter*, 561 F.3d 357, 363 (4th Cir.2009) (noting that a state law is not invalid if "discrimination is demonstrably justified by a factor unrelated to economic protectionism").

 "[T]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *see also Brown*, 561 F.3d at 363 ("The Clause does not purport to restrict or limit intrastate commerce, nor protect the participants in intrastate or interstate markets, nor the participants' chosen way of doing business."). Furthermore, "any notion of discrimination assumes a comparison of substantially similar entities." *General Motors Corp. v. Tracy*, 519 U.S. 278, 298, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997); *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 128 S.Ct. 1801, 1811, 170 L.Ed.2d 685 (2008). " [W]hen the allegedly competing entities provide different products, ... a threshold question [is] whether the companies are indeed similarly situated[,] ... [because] the difference in products may mean that the different entities serve different markets, and would continue to do so even if the supposedly discriminatory burden were removed." *General Motors*, 519 U.S. at 299, 117 S.Ct. 811. If the entities are not similarly situated, "eliminating the ... regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.*

pire to reap some of the benefits of tariffs by other means." *Id.* Examples of such cases, cited by plaintiffs, include laws that impose surcharges on shipment of waste from out-of-state to in-state landfills," *Or. Waste Sys.*, 511 U.S. 93, 114 S.Ct. 1345, tax out-of-state sales of securities more heavily than in-state sales, *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977), or tax residents more heavily for stocks issued by out-of-state corporations, *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996).

14. The court must usually engage in a second "tier" of analysis where the state statute is not facially discriminatory. If the law "regulates evenhandedly and only indirectly affects interstate commerce, ... the law is valid unless the burdens on commerce are 'clearly excessive in relation to the putative local benefits.' " *Envtl. Tech. Council*, 98 F.3d at 785. The joint stipulations entered by the parties state, however, that any burden the Ethanol Blending Statute imposes on interstate commerce is not excessive in relation to its local benefits. (J. Stipulations ¶ 11.) The court therefore limits its consideration to the first tier—whether the Ethanol Blending Statute is facially discriminatory.

Plaintiffs' argument that the Ethanol Blending Statute is facially discriminatory centers on subsection (b) of that statute, which states: "A supplier *that imports gasoline into the State* shall offer gasoline for sale to a distributor or retailer that is not preblended with fuel alcohol and that is suitable for subsequent blending with fuel alcohol." N.C. Gen.Stat. § 75–90(b) (2008) (emphasis added). They contend that the words underlined above submit out-of-state suppliers of gasoline to a burden that in-state suppliers do not bear. The state defendant, on the other hand, argues that the words are simply an indicator of the fact that all gasoline is imported into North Carolina, which is not an oil-producing state. (*See also* J. Stipulations ¶ 16.) Defendants argue that plaintiffs have not demonstrated two classes of "suppliers," and that the stipulations do not support such an assumption.

In *Exxon Corp. v. Governor of Md.*, the Supreme Court held that a Maryland statute prohibiting producers or refiners from operating retail service stations within the State "does not discriminate against interstate goods, nor does it favor local producers and refiners. Since Maryland's entire gasoline supply flows in interstate commerce and since there are no local producers or refiners, such claims of disparate treatment between interstate and local commerce would be merit less." 437 U.S. at 125, 98 S.Ct. 2207. The court's reasoning in *Exxon* and the principles set forth in *General Motors* lead to the conclusion

that, to the extent the Ethanol Blending Statute treats out-of-state refiners differently from in-state producers and distributors, it is not facially invalid under the dormant Commerce Clause.

■ Plaintiffs' argument, however, is not premised on distinctions between out-of-state refiners and in-state producers and distributors. Instead, they argue that subsection (b) discriminates between two classes of suppliers'[15]—those engaging in importation and those conducting only intrastate business. Nevertheless, this argument also fails under *Exxon* and *General Motors*. First, there is no factual support for the existence of suppliers who only operate in intrastate commerce. The State, defending against a facial Commerce Clause challenge, "receives the benefit of any plausible factual suppositions," *Baude v. Heath*, 538 F.3d 608, 613 (7th Cir.2008), and "a hypothetical possibility of favoritism [does not] constitute discrimination that transgresses constitutional commands," *Associated Indus. v. Lohman*, 511 U.S. 641, 654, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994).

Second, recalling its duty to adopt a construction of a statute that avoids constitutional infirmity if possible, *see Harris*, 536 U.S. at 555, 122 S.Ct. 2406, and the canon of statutory construction that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803,

---

**15.** As defined in the Ethanol Blending Statute, "supplier" includes not only refiners, but also fuel alcohol and biodiesel providers, and "position holder[s] or ... person[s] who receive[ ] motor fuel pursuant to a two-party exchange." N.C. Gen.Stat. § 105–449.60(46). A "position holder" is "[t]he person who holds the inventory position on the motor fuel in a terminal," meaning that person "has a contract with the terminal operator for the use of storage facilities and terminaling services for fuel at the terminal" or is "a termi-

nal operator who owns fuel at the terminal." *Id.* § 105–449.60(39). A "two-party exchange" is "[a] transaction in which motor fuel is transferred from one licensed supplier to another licensed supplier pursuant to an exchange agreement under which the supplier that is the position holder agrees to deliver motor fuel to the other supplier or the other supplier's customer at the rack of the terminal at which the delivering supplier is the position holder." *Id.* § 105–449.60(57).

809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989), the court finds the most likely reading of the Ethanol Blending Statute is one discriminating in favor of a below the rack entities as opposed to above the rack entities, which entities are not similarly situated.[16] This reading is consistent with subsection (c), which indicates legislative findings that "gasoline may be blended with fuel alcohol below the terminal rack by distributors and retailers as well as above the terminal rack by suppliers...." The inclusion of the challenged phrase in subsection (b) requiring a supplier "that imports gasoline" to offer gasoline that is not preblended therefore indicates merely that all gasoline must be imported into the State before it reaches the rack, and that distributors and retailers would be unable to blend if all gasoline imported into the State was preblended.

Finally, assuming that the word "suppliers" does in fact encompass entities distinctly engaging in either intrastate and interstate commerce, such entities are not necessarily similarly situated simply because the same word is used to describe them in the statute. Because North Carolina does not have local producers or refiners, all gasoline must be imported into the state. Suppliers that import gasoline into the state therefore provide a different service than suppliers who purchase that gasoline after import. Importing "suppliers" and non-importing "suppliers" are in fact "different entities serv[ing] different markets, and would continue to do so even if the supposedly discriminatory burden

were removed." *General Motors*, 519 U.S. at 299, 117 S.Ct. 811.

As such, plaintiffs' motion for summary judgment premised on facial invalidity under the Commerce Clause is DENIED. Defendant and intervenor-defendant's cross-motions for summary judgment are ALLOWED in corresponding part.

## CONCLUSION

For the foregoing reasons, the court DENIES plaintiffs' motion for summary judgment as revised (DE # # 10, 40). The court ALLOWS defendant and intervenor-defendants' cross-motions for summary judgment in corresponding parts (DE # # 42, 44). These motions are granted specifically as they relate to plaintiffs' facial challenges with regards to the federal renewable fuels program based on obstacle preemption of the program's goals and flexibility, the PMPA based on express preemption under a "failure to comply with reasonable contractual provisions" theory, the Lanham Act, and facial invalidity under the Commerce Clause. The court ALLOWS plaintiffs' motion to file documents under seal (DE # 46), DENIES intervenor-defendant's motion for a hearing (DE # 58), and DISMISSES as MOOT defendant's motion for dismissal of plaintiffs' as-applied challenges on ripeness grounds (DE # 42).

With deference to the current posture of the case, the parties shall confer within twenty-one (21) days hereof on issues concerning the case schedule, including discovery, new motions filing deadline(s), and

---

**16.** A "rack" is "[a] mechanism for delivering motor fuel from a refinery, a terminal, or a bulk plant into a transport truck, a railroad tank car, or another means of transfer that is outside the terminal transfer system." N.C. Gen.Stat. § 105–449.60(27). A "terminal" is "[a] motor fuel storage and distribution facility that ... is supplied by pipeline or marine vessel, and from which motor fuel may be removed at a rack," *id.* §. 105–449.60(34), while a "terminal transfer system" is "[t]he motor fuel distribution system consisting of refineries, pipelines, marine vessels, and terminals," *id.* § 105–449.60(36). "Above the rack" and "below the rack" refer to entities that supply fuel to the rack or that transport and deliver fuel away from the rack, respectively.

a suggested trial date, and such other pretrial matters as may be necessary to consider pursuant to the rules, and file a joint report and plan in supplement their previously-filed plans. Thereafter, the court will enter its comprehensive case management order. If any party requests conference with the court, prior to entry of that order, said request shall be noted on the face of the joint report.